I97AAFLO1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

VICENTE CARRASCO FLORES, et
al.,

                    Plaintiffs,

            v.                          17 CV 6915 (LGS)

NYC PASTA AND RISOTTO CO. LCC,
et al.,

                    Defendants.

------------------------------x

                                    New York, N.Y.
                                    September 7, 2018
                                    9:15 a.m.

Before:

                HON. LORNA G. SCHOFIELD,

                                    District Judge

                        APPEARANCES

MICHAEL FAILLACE & ASSOCIATES PC
        Attorneys for Plaintiffs
BY:  COLIN J. MULHOLLAND
        SARA ISAACSON

LEHMAN LAW GROUP LLC
        Attorneys for Defendants
BY:  BRIAN E. LEHMAN
        JULIE R. SOLARZ


ALSO PRESENT:

Marcia Gotler, Spanish Interpreter
Jan Calloway, Spanish Interpreter

1          THE COURT:  Good morning, everybody.

2          You may be seated.  You had a chance to chat with each

3     other this morning?

4          MR. MULHOLLAND:  We haven't chatted other than the

5     e-mails that were distributed this morning.

6          THE COURT:  Tell me where things stand.  Start with

7     plaintiffs.  Then I'll hear --

8          MR. MULHOLLAND:  It is my understanding that the

9     parties are prepared to agree to stipulate to the facts that

10    are outlined in the post stipulation that I e-mailed to the

11    Court this morning.

12         THE COURT:  OK.  And are there any outstanding facts

13    then that need to be found apart from the two issues that the

14    defendant has expressly tried to reserve?

15         MR. MULHOLLAND:  Yes.  Just the tools of the trade.

16         THE COURT:  OK.  And it's the amount of the tools of

17    the trade?

18         MR. MULHOLLAND:  Yes.

19         THE COURT:  All right.  I'm curious because both

20    plaintiffs testified about dollar amounts for tools of the

21    trade, not precise dollar amounts but estimated dollar amounts.

22    Could that be a basis for stipulating to this number?

23         MR. MULHOLLAND:  I would be happy to --

24         THE COURT:  OK.  Somebody want to come up with a

25    number or I'll pull up my notes.

1          MR. MULHOLLAND:  I could take a look at the trial

2     transcript on my phone and propose a number.

3          THE COURT:  Sure.  And your transcript is on your

4     phone?

5          MR. MULHOLLAND:  Yes.

6          (Pause)

7          THE COURT:  So my notes say that he bought three

8     bicycles.  Maybe someone with a calculator -- the first one was

9     1300.  The second one was 950.  The third one was 700.  And he

10    said he had to change the inner tubes that was 60 and the

11    brakes, that was 80.  So could we add all of those three

12    numbers up.

13         MR. MULHOLLAND:  Absolutely.  I have $3,290.

14         THE COURT:  OK.  Are the defendants prepared to

15    stipulate to that number for the tools of the trade for

16    Mr. Carrasco?

17         MR. LEHMAN:  Yes, your Honor.  If those are the

18    numbers in the transcript then we stipulate to them.  My

19    co-counsel has 1300.

20         MS. SOLARZ:  I could have heard wrong.

21         THE COURT:  Oh, I'm sorry.  These are just my notes.

22    I have 1300 for the first number, the 950, 700.  So it would be

23    $3,090.

24         MR. LEHMAN:  The defense will stipulate to that.

25         THE COURT:  OK.  All right.  So.

1          MR. MULHOLLAND:  Ms. Mukhina testified she bought some

2     pants and some shirts.  She testified she bought $20 shirts.

3          THE COURT:  I have 25 to $30 pants.  Sorry and $20

4     shirts, right, three or four times a year?

5          MR. MULHOLLAND:  Yes.

6          THE COURT:  So why don't we say pants are 30, shirts

7     are 20, is 50.  Why don't we say 50 times three and a half.

8          MR. MULHOLLAND:  Yes, your Honor.  That's fine.

9          THE COURT:  So that's 175 and then five aprons for 40

10    is 215 for total for Ms. Mukhina.

11         MR. MULHOLLAND:  Yes.

12         THE COURT:  OK.  Let me take a look at the

13    stipulation.

14         Mr. Lehman, will you stipulate the 215 is the amount

15    for the tools of trade for Ms. Mukhina's clothing?

16         MR. LEHMAN:  Yes, your Honor, the defendant's

17    stipulate to that.

18         MR. MULHOLLAND:  Your Honor, how would we enter the

19    rest of the stipulation into the record, by signature, by

20    reading it into the record, something else?

21         THE COURT:  Let me just read it first and then we'll

22    talk about that.

23         (Pause)

24         THE COURT:  Just for my verification, paragraph 10

25    under "Carrasco", does that mean that he worked six days per

1    workweek that exceeded 10 hours so he would be entitled to

2    spread of hours six days a week for the time he worked?

3               MR. MULHOLLAND:  Yes.

4               THE COURT:  OK.  Thank you.

5               OK.  So what I propose concerning the stipulation, the

6    jury doesn't really need any of this for the findings that they

7    need to make.  So what I suggest do you is that you sign it.  I

8    will mark it as a court exhibit and enter it into the record in

9    that way.

10              MR. LEHMAN:  Your Honor, that sounds good.  I just

11   want to be clear, for the record that the company stipulating

12   to this as far as the facts with regard to the mental state of

13   the --

14              THE COURT:  Wait.  Wait.  Wait.  Wait.  I understand

15   the company is stipulating to this.  I presume that in the

16   event the individual defendants are found liable, they are also

17   stipulating to it.

18              MR. LEHMAN:  That is exactly right.

19              THE COURT:  Go ahead.  I am sorry.

20              MR. LEHMAN:  Just those two areas of issues remaining

21   are those individual defendants, the employers is to find under

22   the FLSA and if so, did they not willfully.  There is an

23   affirmative defense of good faith but we are dropping that

24   because it's in the affirmative defense so those will be the

25   only two issues here.

I97AAFLO1

1          THE COURT:  OK.

2          MR. LEHMAN:  I assume but I want to make clear here

3    we're agreeing that these facts will not be used in front of

4    the jury to try to prove or disprove those two issues.

5          Does plaintiff's counsel agree to that?

6          THE COURT:  In other words, there is no need to

7    introduce these facts to the jury that are in the stipulation?

8          MR. MULHOLLAND:  Yes.  That's fine.

9          MR. LEHMAN:  One more clarification?

10          THE COURT:  Yes.

11          MR. LEHMAN:  With that said, the testimony may be

12    presented to the jury for those two issues on credibility

13    issues?

14          THE COURT:  Yes.  In other words, those two issues

15    will be presented to the jury.  There are two more witnesses,

16    then the jury will be given the instruction that I circulated

17    yesterday evening on these two issues.

18          MR. LEHMAN:  Agree, your Honor.

19          THE COURT:  Is that OK with the plaintiff?

20          MR. MULHOLLAND:  Yes, your Honor.

21          THE COURT:  All right.  So I wonder if we should -- do

22    you both have copies hard copies of the stipulation?

23          MR. LEHMAN:  Yes, your Honor.

24          THE COURT:  I wonder if we should add just on the last

25    page below my signature.  You could initially just write it in

1   and let's agree on the language first that plaintiff Carrasco

2   incurred tools of the trade expenses totaling $3090, then

3   another paragraph, plaintiff Mukhina incurred expenses tools of

4   the trade of $215.

5          MR. LEHMAN:  Yes, your Honor.

6          THE COURT:  Does somebody want to write that in?

7          MR. MULHOLLAND:  Yes.

8          THE COURT:  You'll both sign one copy and then I will

9   mark it as a court exhibit.

10          (Pause)

11          THE COURT:  So there are two housekeeping matters.

12   One is I saw that the defendant filed a Rule 50 motion

13   yesterday for directed verdict on the employer issue.  I will

14   reserve decision on that until the close of the plaintiff's

15   case but thank you for alerting me to it.

16          MR. LEHMAN:  Yes, your Honor.  There is one issue on

17   that.  I expect to renew it once all the witnesses have

18   testified.

19          THE COURT:  You can just stand up and say "I renew my

20   motion".

21          MR. LEHMAN:  I just wanted to make sure the language

22   is there.

23          THE COURT:  That's fine.  I also got your comments on

24   the proposed verdict sheet.  And what I suggest is at some

25   point we'll have a break and a short charging conference and we

1    can discuss it then.  OK?

2              MR. MULHOLLAND:  Thank you.

3              THE COURT:  All right.  So I just want to express my

4    appreciation to both counsel for the diligence because I know

5    you've basically been working all night and all morning to try

6    to accomplish this and you have.  So congratulations.  I

7    appreciate it.

8              MR. MULHOLLAND:  Thank you, your Honor.

9              Oh, we have a copy of the stipulation executed.

10             THE COURT:  OK.  Do you want to hand that up?

11             MR. MULHOLLAND:  Sure.

12             (Pause)

13             THE COURT:  So we had two notes yesterday which were

14   Court Exhibits Three and Four.  So this signed stipulation

15   would be Court Exhibit Five.  Let's deal with the two notes.

16             The first note is:

17             Can we see the text messages text for approval of the

18   checks?

19             We had already discussed that.  Essentially, what I am

20   going to tell the jury is "the evidence is what the evidence

21   is".  And it's up to the parties to present the evidence.  And

22   they shouldn't speculate about why certain evidence is not

23   introduced.

24             The other question which I don't think you knew about

25   is --

1          MR. LEHMAN:  Your Honor?

2          THE COURT:  Yes.

3          MR. LEHMAN:  I don't know if there is a way to put it

4     or not but to refer to it as "evidence" when it is not in

5     evidence, you should not speculate it as evidence that was not

6     submitted.  I just want to be clear with the jury the evidence

7     is what was presented here.  There may be other documents and

8     other things out there but that's not evidence.

9          THE COURT:  I'll say, "You shouldn't speculate about

10    documents accepted by the Court that's not evidence."

11         MR. LEHMAN:  Thank you, your Honor.

12         THE COURT:  So then we have Court Exhibit Four which

13    is a question.

14         You had a check from 2016 but you left work

15    August 2015.  Is that because you were paid late?

16         And this was a question for Ms. Mukhina.  I'm not sure

17    that is directly relevant to either of the issues here but

18    there's nothing improper about the question.  And it is within

19    the scope of the direct.  So I'm inclined to just actually

20    maybe there's a better way to do this.  Maybe I can just find

21    out the answer from Ms. Mukhina and I'll tell the jury what the

22    answer is.

23         The check was from 2016.  You left work 2015.  Do you

24    know why that is?

25         MS. MUKHINA:  That's because after I left they still

1    owed me money and I tried to get the payments from Satinder

2    Sharma and that's why he gave me some checks after couple of

3    checks.

4                    THE COURT:  OK.

5                    MR. LEHMAN:  Your Honor, we agree with that statement

6    and would like for that full statement to be read to the jury

7    since that's the answer to the question.

8                    THE COURT:  OK.  I need to find it then.

9                    Off the record.

10                   (Discussion held off the record)

11                   THE COURT:  Let's go back on the record.

12                   So I need to tell the jury that the scope of the trial

13   is reduced and so I need to say something and I am inclined to

14   try to get it from one of the e-mails.

15                   (Pause)

16                   THE COURT:  OK.  This is what I propose saying:

17                   The corporate defendant, in other words, the

18   restaurant, admits that it did not pay the plaintiffs the wages

19   and monies claimed by them under the federal and state labor

20   laws.  That means you will not have to render a verdict on

21   those issues.  The individual defendants assert however, that

22   they were not plaintiffs' employers within the meaning of the

23   labor laws and only if you find that they were that their

24   resulting violations were not willful.  That's not that clear.

25                   So let's say the individual defendants assert two

things however, first that they were not plaintiffs' employer

within the meaning of the labor laws.  And second, only if you

find that they were that there was resulting violations were

not willful.

            So that means only two issues remain for you to decide

whether the individual defendants were plaintiffs' employers

and you will have to answer that as to each employer and each

plaintiff -- answer that question.  And only if so, whether the

individual defendants' violations were willful within the legal

definition that I will give you.

            MR. MULHOLLAND:  Could I hear that one more time?

            THE COURT:  Sure.  Which part?

            MR. MULHOLLAND:  The part about willfulness.

            THE COURT:  Sure.  And only if so, whether the

individual defendants' violations were willful within the legal

definition that I will give you.

            MR. MULHOLLAND:  It sounds like the individual

employer liability is contingent upon a finding of willfulness.

            THE COURT:  No.

            MR. MULHOLLAND:  No.

            THE COURT:  Let me read the whole paragraphs.  So that

means only two issues remain for you to decide whether the

individual defendants were plaintiffs' employers and you'll

have to answer that question as to each employer and each

plaintiff and -- I think we should do first and second here.

1          MR. LEHMAN:  Your Honor, may I ask a question?

2          THE COURT:  Sure.

3          MR. LEHMAN:  I believe that the damages are the same

4     regardless of whether or not there is willfulness because of

5     the state laws.  So I would just ask Mr. Mulholland is this a

6     question that he wanted to present given that the amount would

7     be the same regardless unless I'm inaccurate.

8          MR. MULHOLLAND:  Well, yeah.  I mean, the same.  I was

9     just concerned that the language it sounded like the employer,

10    they were going to be individually liable he had to be willful.

11         THE COURT:  No.  I'll say in a second only if you find

12    that a particular individual defendant was an employer, then

13    you will have to decide whether that individual defendants'

14    violations were willful.

15         Is that OK?

16         MR. MULHOLLAND:  Yes, your Honor.

17         MR. LEHMAN:  So two points on that, your Honor.  The

18    first is I just want to be clear what I'm saying.  If they are

19    not willful she gets --

20         THE COURT:  I understand what you are saying but I

21    think --

22         So Mr. Lehman is asking you, Mr. Mulholland, whether

23    you still want to be able to have as part of your case the

24    issue of willfulness.  He says it doesn't matter.  I have not

25    considered that issue.

1          MR. LEHMAN:  If there's confusion we could eliminate

2     and the damages, could be the statement but I will defer to

3     him.

4          THE COURT:  You can make your argument later about how

5     the damages are the same but if Mr. Mulholland agrees now, then

6     we don't have to ask them about the question of willfulness.

7     Willfulness affects the statute of limitations for the FLSA

8     violations and to the extent it is from two to three years?

9          MR. LEHMAN:  Yes.  The state law is six years.  So

10     that's the only affect it's having on this case.

11          THE COURT:  Except are there particular damages that

12     are only FLSA damages?

13          MR. MULHOLLAND:  No.

14          THE COURT:  So can we get rid of the willfulness

15     questions since the labor law violations, the New York labor

16     law violations are admitted?

17          MR. MULHOLLAND:  We could.  I guess you should clarify

18     that it's an employer under both the New York Labor Law and --

19     but under both FLSA and the New York labor law.

20          THE COURT:  OK.  The corporate defendant, in other

21     words the restaurant, admits that it did not pay the plaintiffs

22     the wages and monies claimed by the plaintiffs under the

23     federal and state labor laws.  That means you will not have to

24     render a verdict on those issues.  The individual defendants

25     assert however that they were not plaintiffs' employers within

1   the meaning of the labor law.  So that means only one issue

2   remains to decide whether the individual defendants were

3   plaintiffs' employers and you will have to answer that question

4   as to each of the employers of the plaintiff.

5            MR. LEHMAN:  Agreed, your Honor.  One minor point?

6            THE COURT:  Yes.

7            MR. LEHMAN:  To my ears each ease we are, you say they

8   assert that sounds like an affirmative defense, so I would

9   suggest maintain but if not --

10           THE COURT:  If you're happy with "maintain", that's

11  fine.

12           MR. LEHMAN:  There's no way they are not going to pick

13  that up.

14           THE COURT:  Is that OK?

15           MR. MULHOLLAND:  Yes, judge.

16           THE COURT:  So that's what I'm going to tell them.  So

17  the housekeeping issues are first that then I'll deal with the

18  two notes and then we'll continue with our witnesses.

19           Off the record.

20           (Discussion held)

21           THE COURT:  Back on the record.

22           Since we're waiting I will give you a partial ruling

23  on the Rule 50 motion and I will deny it in part and reserve it

24  in part as follows:

25           As you know under Rule 50 the standard is whether a

I97AAFLO1

```
 1  reasonable jury would have a legally sufficient evidentiary

 2  basis to find for the party on that issue and if that

 3  evidentiary basis is insufficient the Court may resolve the

 4  issue against the party.

 5           So you have asked me, Mr. Lehman, for defendants to

 6  resolve the issue of whether the individual defendants were

 7  employers of the individual plaintiffs and you've essentially

 8  alleged that the evidence was insufficient so that no

 9  reasonable jury could find that.  So my partial ruling is as

10  follows:

11           First, as to defendant Sharma, the evidence even as it

12  has proceeded thus far as sufficient for a reasonable jury to

13  conclude that he was plaintiff Mukhina's employer.  First, the

14  evidence showed that he's a 50 percent owner of the business.

15  When problems with payments occurred Ms. Mukhina's co-workers

16  directed her to Mr. Sharma.  Mr. Sharma communicated by text

17  message about delays in payroll payments.  Ms. Mukhina was

18  provided with blank checks to be used for her payroll signed by

19  Mr. Sharma.  She testified that Mr. Sharma personally

20  instructed her how to fill them out and when to deposit them.

21  And we saw physically had evidence that some payroll checks

22  were signed by Mr. Sharma.

23           As you know I have to construe the evidence and make

24  inferences.  Contrary to the nonparties I am going to assume

25  for this purpose that all of that evidence is believed by the
```

I97AAFLO1

1    jury and all inferences drawn in favor of plaintiff and

2    therefore, deny the motion as to defendant Sharma and plaintiff

3    Mukhina.

4              Second, with regard to defendant Sharma, again,

5    evidence I find was sufficient for a reasonable jury to

6    conclude that he was plaintiff Carrasco's employer.  The

7    evidence, of course, is much thinner there but although, there

8    was no evidence offered to support the inference directly as to

9    Mr. Carrasco, drawing all inferences in his favor as to the

10   nonmoving party a reasonable jury could infer from the evidence

11   presented through Ms. Mukhina that Mr. Sharma was significantly

12   involved generally in employee payroll issues.

13             So I deny the motion as to Mr. Sharma and

14   Mr. Carrasco.

15             Finally, I deny the motion as to defendant Montoya and

16   plaintiff Carrasco.  The evidence was sufficient for a

17   reasonable jury to conclude that defendant Montoya was

18   plaintiff Carrasco's employer.  The evidence showed that

19   Mr. Montoya gave Mr. Carrasco his schedule, that Mr. Montoya

20   gave Mr. Carrasco orders and assignments everyday, that

21   Mr. Montoya and that those included that Mr. Carrasco's shift

22   was finished after he cleaned the stoves and the floor and that

23   Mr. Montoya sometimes castigated or disciplined Mr. Carrasco.

24             Again, drawing all inferences in favor of the

25   nonmoving party, Mr. Carrasco therefore, assuming that all that

I97AAFLO1

1     is true, I deny the motion with regard to Montoya and Carrasco.

2              I reserve on the issue of whether defendant Montoya.

3     Whether a reasonable jury could conclude that defendant Montoya

4     was Mr. Carrasco's employer, there has not been any evidence to

5     support that inference but we still have further witnesses to

6     hear from and so I reserve on that.

7              MR. MULHOLLAND:  Your Honor, you mean whether

8     Mr. Montoya was Ms. Mukhina's employer?

9              THE COURT:  I misspoke.  You're right, I think.  Yes,

10    Mr. Montoya was Ms. Mukhina's lawyer.  You are absolutely

11    correct.  Thank you.

12             MR. LEHMAN:  So for purposes of reserving issue on the

13    Rule 50, I need to renew that motion at the end of the jury,

14    I'd have to assume based on your reasons now that that will be

15    denied just for --

16             THE COURT:  Except as to we haven't heard anything yet

17    from Montoya about Montoya and -- so you have to renew your

18    motion.  And what I will probably do is just say that I reserve

19    and then what I'll rule on that last piece.

20             MR. LEHMAN:  I would prefer not to say I renew my

21    motion and denied --

22             THE COURT:  OK.  If you want me to deem your motion

23    renewed and we'll understand at the end of the presentation of

24    the plaintiffs' case you will have renewed your motion, I will

25    have deferred, that's fine with me.

I97AAFLO1

1          MR. LEHMAN:  OK, your Honor.

2          THE COURT:  All right.  Mr. Lewis, which further word

3    on the trains or the jury?

4          THE DEPUTY CLERK:  No.

5          THE COURT:  Any further word from Mr. Street?

6          THE DEPUTY CLERK:  No.

7          THE COURT:  We can go off the record.

8          (Discussion held)

9          (Jury present)

10         THE COURT:  You may be seated.

11         Good morning, ladies and gentlemen.

12         I know we're missing one juror but we've really waited

13   as long as we would wait and because I promised we would get

14   done today, we're going to proceed.  And unfortunately, the

15   other juror will have to be excused when he or she arrives.  I

16   don't actually recall who it is that's missing.

17         In any event, we have not been wasting the time that

18   we were waiting and you were in the jury room.  So let me just

19   read something to you.  The case has been significantly

20   narrowed.  Meaning, there's much less for you to decide.

21         So the corporate defendant, meaning the restaurant,

22   admits that it did not pay the plaintiffs the wages and monies

23   claimed by the plaintiffs under the federal and state labor

24   laws.  That means that you will not have to render a verdict on

25   those issues.

I97AAFLO1

1            The individual defendants however, maintain that they

2       were not plaintiffs' employers within the meaning of the labor

3       laws.  So that means only one issue remains for you to decide

4       and that is whether the individual defendants, whether each of

5       them or each of them were each of the plaintiffs employers.

6       And so you'll have at the end I'll give you instructions on

7       what an employer is.  I'll show you the verdict form but you'll

8       have to answer that question as to each employer and each

9       plaintiff.  OK?  So that's the only issue on the table.

10           Now, yesterday we had two questions from the jury.

11      The first question which I am marking as Court Exhibit Three

12      is:

13           Can we see the text messages, text for approval

14      checks?

15           And I took that to mean the text messages that

16      Ms. Mukhina had testified about exchanging with Mr. Sharma.  I

17      am sorry I can't be very helpful to you on this.  The evidence

18      is what the evidence is and so you are to make your judgment

19      based on what's in evidence and you should not speculate about

20      documents or anything that either is in evidence or not in

21      evidence.  Just don't speculate about it.  All right?

22           The other question is:

23           You had a check from 2016 but you left work in

24      August 2015.  Is that because you were paid late?

25           And so rather than call Ms. Mukhina to the stand I

 1    asked her the question and the court reporter took down her

 2    answer and I'll just have that read to you now.

 3             (Testimony read back)

 4             THE COURT:  OK.  So I think we're ready to proceed.

 5             Plaintiffs, would you like to call your next witness.

 6             MR. MULHOLLAND:  Yes, your Honor.

 7             plaintiffs would like to call Mr. Sharma himself.

 8             THE COURT:  OK.  Mr. Sharma.

 9    SATINDER SHARMA,

10        called as a witness by the Plaintiffs,

11        having been duly sworn, testified as follows:

12    DIRECT EXAMINATION

13    BY MR. MULHOLLAND:

14    A.  Satinder Sharma, S-A-T-I-N-D-E-R, S-H-A-R-M-A.

15             Good morning.  I'd like to apologize.  I was born and

16    raised in India, so I have a very heavy accent.  A lot of

17    people have told me that I'm difficult to understand.  So in

18    case I don't come across, I am apologizing in advance.  Please

19    let me know and I will repeat myself and clarify.

20             THE COURT:  OK.

21    BY MR. MULHOLLAND:

22    Q.  Mr. Sharma, isn't it true that you are one of two owners of

23    Pasta & Risotto?

24    A.  Yes.

25    Q.  Isn't it true that you had the power to hire and fire the

 1   staff at Pasta & Risotto?

 2   A.  No.

 3           THE COURT:  The only way this works is the reporter

 4   takes everything down is wait for the full question and then

 5   you could give your answer.

 6           MR. LEHMAN:  Your Honor, I still can't hear.  So

 7   please speak up.

 8           THE COURT:  Get really close to the mic.

 9           All right.  If you could repeat your question.

10   Q.  Isn't it true, Mr. Sharma, that you had the power to hire

11   and fire staff at Pasta & Risotto?

12   A.  No.

13   Q.  Do you recall testifying at a deposition with me back on

14   April 16, 2018?

15   A.  Yes, I remember.

16   Q.  Do you remember testifying differently in regard to that

17   question?

18   A.  Could you refresh my memory?

19   Q.  Absolutely.

20           MR. MULHOLLAND:  Your Honor, I have copies of the

21   deposition transcript.  I'd like to bring a copy to the

22   witness.

23           THE COURT:  That's fine.  You can give it to Mr.

24   Street.

25           (Pause)

1   Q.  Mr. Sharma, if I could direct your attention to page 66.

2   Do you see lines four through 10?

3   A.  Yes.

4   Q.  Do you still stand by your testimony today that you did not

5   have the power to hire and fire people at Pasta & Risotto?

6             MR. LEHMAN:  Your Honor, objection.  That's not what

7   lines four through 10 say.

8             THE COURT:  Well --

9             MR. MULHOLLAND:  Perhaps, I could read it to the

10  Court?

11            THE COURT:  Why don't you -- you can do that.

12            MR. MULHOLLAND:  Starting at line four.

13  "Q.  As an owner of Pasta & Risotto, did you have the power to

14  fire any of these managers?

15  "A.  As an owner of Pasta & Risotto, did I have the power?

16  "Q.  Yes.

17  "A.  As an owner I would say "yes".

18            THE COURT:  OK.  Did you give that testimony?

19            THE WITNESS:  Yes, I did.

20  Q.  OK.  So were you telling the truth back in April or are you

21  telling the truth today?

22            MR. LEHMAN:  Your Honor, that is an objectionable way

23  of phrasing this.

24            THE COURT:  Sustained.  We've already established that

25  he testified to it before.

1          MR. MULHOLLAND:  Thank you, your Honor.

2     Q.  Do you ever hire managers at Pasta & Risotto?

3     A.  I beg your pardon.

4     Q.  Do you ever hire managers at Pasta & Risotto?

5     A.  In Pasta & Risotto I hired the management team and they

6     hired the managers.

7     Q.  OK.

8     A.  Actually, me and my partner, this is how our businesses was

9     set up.  We had investments running from South Jersey all the

10    way up to Manhattan.  Back then we had a lot more restaurants.

11    The way it worked was that I was from the restaurant

12    background.  We would a broker.  Somebody would bring in a

13    specific investment to us.  And we would set up a management

14    team and place a corporation that would take care of business.

15    Each one was a separate business entity which was managed by

16    professionals.  So we had a general manager.  We had a group

17    executive chef and they would basically take care of everything

18    when it came to on the unit level.  So my role on the unit

19    level was zero.

20    Q.  Was zero?  Isn't it true that you signed checks?

21    A.  Any business entity that we set up, the bank account has to

22    have a signatory.  So by default I would be a signer on the

23    bank accounts.  Each unit manager and manager were all

24    signatories.  As a back up if they are not available or if they

25    are on leave, I would be asked to leave blank checks.  So I

1   would leave blank checks just so that he operation does not get

2   disrupted.

3   Q.  Sir, you signed checks from Pasta & Risotto to pay to the

4   staff members; isn't that true?

5   A.  I beg your pardon?

6   Q.  Sir, you signed checks for Pasta & Risotto to make payments

7   to the staff members?

8   A.  I paid checks for -- I signed blank checks.  If you see the

9   checks that you presented yesterday, so you point out --

10          THE COURT:  Let me just clarify how we proceed here.

11  The way this works here is he asks a question.  You just answer

12  the question.  Your lawyer has the opportunity when he is done

13  to ask you whatever follow-up.  So you don't have to make any

14  speeches.  You can just answer the question and then wait for

15  your lawyer to follow-up.

16          THE WITNESS:  Sorry.

17  Q.  The answer is "yes" that you signed checks that were made

18  for payment to staff at Pasta & Risotto?

19  A.  Yes, I signed checks.

20  Q.  So you were aware of how Ms. Mukhina was being paid?

21  A.  Not literally, but yes.

22  Q.  OK.  Isn't it true that you received daily income reports

23  by text from Ms. Mukhina for years while she was employed at

24  Pasta & Risotto?

25  A.  It's a group list that comes to all the partners and

1    general manager and the executive chef every might when every

2    restaurant closes.

3    Q.  So the answer is "yes"?

4    A.  The answer is, yes, we get daily nightly reports as to

5    which business did how much sale at the end of the night.

6           THE COURT:  Which business did how much sales at the

7    end of the night.

8    Q.  OK.  Sir, and you responded to those texts and noted to

9    Ms. Mukhina that she received on a daily basis; is that

10   correct?

11   A.  I beg your pardon?

12   Q.  Isn't it true that when Ms. Mukhina would you send you

13   those daily reports, you would often respond to the group

14   message saying that you had received it and thank you?

15   A.  My standard response to every text is "thank you and good

16   night".

17   Q.  That another way of saying "yes"?

18   A.  It's a way of presenting you know thank you very much for

19   taking the time to send it, not just to me, to everybody else

20   as well.  I am trying to be, basically, exchanging pleasantry

21   rather than having any other mode -- at that stage.

22   Q.  Is it true that you communicated with Ms. Mukhina by text

23   message about your late payments?

24   A.  She and I started talking after the business closed.

25   Q.  Isn't it true that you would authorize Ms. Mukhina when to

1   fill-out checks and when to deposit those checks; isn't that

2   true?

3   A.  I beg your pardon?

4   Q.  Isn't it true that you would authorize Ms. Mukhina to fill

5   out checks and to deposit checks you had signed by text

6   message?

7           MR. LEHMAN:  Your Honor, objection; ambiguous.

8           THE COURT:  Overruled.

9   A.  I would.  After the restaurant closed she must be paid.  So

10  she would ask me can I deposit the check and I would tell her

11  yes, after the restaurant closed.

12  Q.  OK.  The answer is again, yes, perhaps?

13  A.  After the restaurant closed.

14  Q.  Isn't it true that some of those checks bounced?

15  A.  I don't remember.

16  Q.  Perhaps I can refresh your recollection.  I'd like to offer

17  for impeachment purposes for identification purposes what's

18  been marked as Plaintiff's Exhibit Four?

19          THE COURT:  OK.  You'll give a copy to counsel and to

20  the witness and me.

21          MR. LEHMAN:  Your Honor, objection.  This is new

22  evidence.

23          THE COURT:  Overruled.  It's cross.  It's for

24  impeachment.

25          MR. LEHMAN:  But --

I97AAFLO1                        Sharma – Direct

1            THE COURT:  Overruled.  We don't have speaking

2   objections in front of the jury.

3            (Continued on next page)

1          THE DEPUTY CLERK:  You have a copy for the Court?

2          MR. MULHOLLAND:  Yes.

3     BY MR. MULHOLLAND:

4     Q.  Do you recognize these documents?

5     A.  This is a text exchange between me and Valeriya.

6     Q.  Do you recognize them?

7     A.  Yes, I do.

8     Q.  Are they an accurate representation of the texts that you

9     two exchanged?

10    A.  Yes.

11    Q.  Now, does this refresh your recollection about whether any

12    checks bounced that Pasta and Risotto had issued to

13    Ms. Mukhina?

14         THE COURT:  Do you want to direct him to a particular

15    page?

16         MR. MULHOLLAND:  Yes.  The first page.

17         MR. LEHMAN:  Which page?

18         MR. MULHOLLAND:  The first one.

19    A.  Can you please clarify?  I'm a little confused.

20         THE COURT:  You said you didn't recall whether or not

21    any checks had bounced.  So he's showing this document to you

22    to say, does this refresh your memory about whether or not any

23    checks bounced?  Don't read from the document, because it's not

24    in evidence, but the question is:  Yes or no, does this refresh

25    your memory about whether any checks bounced?

1           THE WITNESS:  This specific one?  No.

2           THE COURT:  Does it refresh your memory, generally, as

3   to whether any checks bounced?

4           THE WITNESS:  I'm thinking about the papers that I

5   went through when -- which was submitted and I saw yesterday,

6   so there were a couple of checks in there, which -- so this

7   specific one?  No.

8           THE COURT:  But the question is:  Do you recall

9   whether any of the checks bounced?

10          THE WITNESS:  Yes, I do.

11          THE COURT:  You do recall?

12          THE WITNESS:  Yes.

13          THE COURT:  Did any of them bounce?

14          THE WITNESS:  Yes.

15          THE COURT:  Yes?  Okay.

16          MR. LEHMAN:  Your Honor, I'm having trouble hearing

17  because he was talking to you.

18          Please speak into the mic.

19          THE WITNESS:  Yes.

20  BY MR. MULHOLLAND:

21  Q.  Did you ever review the payroll practices in place at Pasta

22  and Risotto?

23  A.  No.

24  Q.  Okay.  Could you take a look at the last page in that

25  document.

I97KFLO2                    Sharma - Direct

1   A.  Yes.

2   Q.  Do you see what's represented there?

3   A.  Yes.

4   Q.  Does this refresh your recollection about whether you

5   reviewed any of the financial documents pertaining to Pasta and

6   Risotto?

7   A.  This was a photograph sent to me by Valeriya.

8           THE COURT:  Wait, let's just wait.  The question was:

9   Did you review the payroll practices?

10          THE WITNESS:  No.

11          THE COURT:  Okay.  And he said no.  He didn't say he

12  didn't recall.

13          MR. MULHOLLAND:  Okay.

14  BY MR. MULHOLLAND:

15  Q.  Isn't it true that this was a photograph of a salary sheet

16  that Ms. Mukhina had sent you?

17  A.  This is a photograph of --

18          THE COURT:  Okay.  Let's just stop again.

19          These documents are not in evidence, and there's a

20  reason they're not in evidence.  So you can't read from the

21  document, but you can ask him:  Isn't it true that Ms. Mukhina

22  sent you whatever or that you received whatever?

23          MR. MULHOLLAND:  Thank you, your Honor.

24  BY MR. MULHOLLAND:

25  Q.  Isn't it true that Ms. Mukhina sent you copies of a salary

1  sheet documenting her pay?

2  A.  No.

3  Q.  No?  Okay.

4          Isn't it true Ms. Mukhina sent you a photograph of a

5  handwritten ledger that she alleged documented her pay?

6  A.  Yes.

7  Q.  Isn't it true that you advised her --

8          THE COURT:  Wait.  What was the answer to that?

9          THE WITNESS:  Yes.

10          THE COURT:  Yes?  Okay.

11  BY MR. MULHOLLAND:

12  Q.  Isn't it true that you advised her that you would have

13  Ganesh reconcile the numbers that she had presented to you with

14  his own spreadsheets and prepare checks?

15  A.  That's the manager.

16  Q.  Sorry?

17  A.  That's the manager.

18  Q.  Yes.  Didn't you tell her you were going to ask him to do

19  that?

20  A.  Yes.

21  Q.  Isn't reviewing ledgers of pay and asking people to

22  reconcile pay sheets, isn't that dealing with the finances of a

23  company?

24  A.  It's directing the person to the right person who's

25  responsible to take care of it.

1   Q.  So Ganesh was a manager, correct?

2   A.  Yes, he was.

3   Q.  Did Ganesh have the authority to sign a lease on behalf of

4   Pasta and Risotto?

5   A.  Beg your pardon?

6   Q.  Did Ganesh have the authority to sign a lease on behalf of

7   Pasta and Risotto?

8   A.  He never did it, but he could.

9   Q.  Oh, he could?

10  A.  Yes.

11  Q.  So he was a member of the LLC?

12  A.  No.

13  Q.  So was there a document granting Ganesh that authority?

14  A.  To?

15  Q.  Did the LLC execute a form granting Ganesh the power to

16  make -- to bind the company to a new lease?

17  A.  No.

18  Q.  So who signed the lease for Pasta and Risotto?

19  A.  Valerie -- sorry, Vajna, Ganesh, Vivek, myself Ajit --

20          THE COURT:  Ajit?

21  Q.  Isn't it true that some of the managers signed off on

22  checks for Pasta and Risotto?

23  A.  Yes.

24  Q.  How do they get the authority to do that?

25  A.  That's how each and every business was set up.  So we would

1  set up a company that would be handed to the senior management

2  team, and they would appoint people who would manage each and

3  everything for us.

4  Q.  Yes, but how did they get the authority?

5  A.  The general manager and the management team would give it

6  to them.

7  Q.  How did the general manager get that authority?

8  A.  That was a meeting between the partners and the different

9  businesses.  Different partners, when we set up an entity, we

10  set up a structure where the business would be run by these

11  guys, and they would run with it, they would take care of it.

12  Q.  And you were one of those partners who granted the

13  authority to general managers to make -- to sign checks on

14  behalf of Pasta and Risotto?

15  A.  Yes, that's correct.

16  Q.  I think you have a binder in front of you.  I'd like to

17  direct your attention to the first tab.

18          THE COURT:  Plaintiffs' Exhibit 1?

19          MR. MULHOLLAND:  Yes.

20  Q.  I'd like to direct your attention to page 17.

21          MR. MULHOLLAND:  Your Honor, if I could publish this

22  to the jury?

23          THE COURT:  You may.

24  Q.  This is your signature, is it not?

25  A.  Yes.

I97KFLO2                    Sharma - Direct

1   Q.  The signatures that appear like this throughout this

2   document are your signature, correct?

3   A.  Yes.

4   Q.  And the date of this check is January 17, 2014?

5   A.  Yes.

6   Q.  So the restaurant closed in August of 2015, correct?

7   A.  Yes.

8   Q.  So it's fair to say that you were interacting with

9   Ms. Mukhina in regards to her pay well before the restaurant

10  closed?

11  A.  No.

12  Q.  How is that possible?

13  A.  As I said, I used to give blank checks in every restaurant.

14  The checks are not written out by me.

15  Q.  Do you ever make an effort to find out if people were being

16  paid their overtime?

17  A.  Beg your pardon?

18  Q.  Did you ever make any effort to find out if people were

19  being paid their overtime?

20  A.  The -- I would basically get the financial results, the

21  numbers -- at the end of the night, end of the week, end of the

22  month, end of the quarter -- by the general manager and the

23  executive chef.

24  Q.  Why were you getting the financial numbers?  I thought you

25  told us you had nothing to do with the finances at Pasta and

1    Risotto.

2    A.  I had to look at my investments.  I was answerable to my

3    partners as well.  So when the partners would meet every so

4    often to find out what was going on in each of the restaurants,

5    the general manager would present us with the financial

6    information of what was going on in each restaurant.

7    Q.  And payroll was a part of that, isn't it?

8    A.  We would get the P&L and the balance sheet.

9    Q.  So you never reviewed you the payroll?  I'm confused.

10   A.  Beg your pardon?

11   Q.  You never paid attention to the pay that was being issued

12   to the staff at Pasta and Risotto?

13   A.  No.

14   Q.  Never?

15   A.  I'm not sure if "never" is the right answer, but that's how

16   we ran our businesses.  I could -- it was physically impossible

17   for me to, you know, look at each and every payroll of each and

18   every business, when you've got half a dozen plus businesses,

19   you know, 50, 60 people working.  Back then, times were better,

20   we had so many restaurants, so many employees, so it was

21   physically impossible for me to get involved with any specific

22   information regarding the restaurants.  So I would look at it

23   more on a macro level than the micro level.

24   Q.  So you're not an employer for any of your many, many

25   restaurants?

1             MR. LEHMAN:  Your Honor, objection; that calls for a

2     legal conclusion.

3             THE COURT:  Sustained.

4     Q.  Who owns Brick Lane Curry House?

5     A.  Me and Ajit now.  In the past, we would have, what, four,

6     five partners, at one point even six.

7     Q.  Who authorized Brick Lane Curry House to write checks to

8     Ms. Mukhina?

9     A.  I don't know.

10    Q.  What does Ms. Mukhina have to do with Brick Lane Curry

11    House?

12    A.  Both the restaurants were in the same building next to each

13    other, so --

14    Q.  They were both owned by you?

15    A.  Yes.

16    Q.  So is it fair to say --

17    A.  They were both our investments.

18    Q.  Wouldn't it be fair to say that the reason Brick Lane Curry

19    House cut a check for Ms. Mukhina is because she really worked

20    for you, regardless of which corporate entity was issuing the

21    check?

22    A.  I am -- I am assuming that after the business closed, maybe

23    that's why she was issued a check; the general manager issued a

24    check from the other entity.

25    Q.  Isn't is true that you held onto some of the time and pay

1    records for Pasta and Risotto, in storage?

2    A.  Beg your pardon?

3    Q.  Isn't it true that you were aware that time and pay records

4    for Pasta and Risotto were being held in storage?

5    A.  After this lawsuit started, my first question was the

6    standard operating procedures of how we, you know, maintained

7    the records.  And I was made to -- I was informed that the

8    records were kept in a storage.  That's how I'm aware of it.

9    Q.  You never asked your managers, your general managers, how

10   they were paying people?

11   A.  They were capable professionals, so I did not want to

12   question their ability.  In other words, no news is good news,

13   is the way I was looking at things.

14   Q.  Indeed.

15        Were you aware that overtime is the law in the

16   entirety of the United States?

17   A.  Yes.

18   Q.  I mean, did you ever have any reason to believe that your

19   employees were exempt from overtime payments?

20   A.  Beg your pardon?

21   Q.  Did you have any reason to believe that your employees were

22   exempt from overtime payments?

23        THE COURT:  Overruled.

24        You may answer.

25        THE WITNESS:  Okay.

1   A.  Can you just rephrase?

2   Q.  Yes.  Did you have any reason -- you knew overtime existed,

3   you knew people had to be paid it.  I mean, did you have any

4   reason to turn a blind eye to how people were being paid at one

5   of your restaurants?

6   A.  No.

7   Q.  Did you make any effort to get advice about how you were

8   supposed to pay people at restaurants?

9   A.  I --

10            MR. LEHMAN:  Your Honor --

11            THE COURT:  Overruled.

12            MR. LEHMAN:  -- he's assuming it's paid.

13            THE COURT:  Overruled.

14   A.  Could you rephrase again?  Because I do not understand your

15   question.

16   Q.  Did you ever seek out advice from anyone about how

17   employees were supposed to be paid at restaurants?

18   A.  Are you asking me if I had my CPA or any of these guys tell

19   us how things were to be done?

20   Q.  Yes.

21   A.  Yes.

22   Q.  Did you ever ask an attorney?

23   A.  I'm trying to refresh my memory, but each and every

24   business was being run the way it's supposed to run by the GM

25   and those guys, and the CPA would make sure that everything was

1    in compliance.

2    Q.  Well, you don't know if the GM was running the restaurant

3    how it should be run, because you never checked; isn't that

4    true?

5    A.  If that's what you are trying to imply, then I would say

6    yes.

7    Q.  Well, you're telling us that you own the place but you

8    didn't know how people were being paid even though you were

9    getting daily reports about finances of the business, even

10   though you were writing checks to people, and then you're

11   telling us that you were sure that the GMs were running it

12   smoothly.  How do you reconcile those two statements?

13   A.  What I'm trying to say is that I would get a number from

14   every restaurant as to which business is doing what on that

15   day.

16   Q.  How many restaurants did you have an ownership interest in

17   back in 2014?

18   A.  At least six, seven investments back then.  At least six,

19   six investments.  I have to sit down and refresh, because

20   from -- after 2008, we basically lost everything.  So I have to

21   sit down and think, the timeline, which restaurants were open,

22   which were closed.

23   Q.  Okay.  How about in 2015?

24   A.  Around the same, I would say.  I'm trying to refresh my

25   memory, how many were open, how many are closed.  One by one,

1   almost all closed, to tell you the truth.

2   Q.  I didn't understand.

3   A.  One by one, all closed.  We had five restaurants in

4   Manhattan.  We have zero right now, as of today, in 2018.

5   Q.  How long have you been in the restaurant industry?

6   A.  In the U.S.?  Since 2002.

7   Q.  Do you have any idea -- withdrawn.

8           Do you recognize the documents in Plaintiffs' Exhibit

9   3?  It's tab 3, page 75.

10  A.  Yes.

11  Q.  What are they?

12  A.  I believe this is a salary sheet.

13  Q.  Was this a document that was maintained on a regular basis

14  at Pasta and Risotto?

15  A.  I think so.

16  Q.  Why do you think so?

17  A.  Because I was physically not present there.  I saw this

18  when I was given this by my attorney.

19  Q.  And you had seen something similar that Ms. Mukhina had

20  sent you by text?

21  A.  Yes.

22  Q.  Is it your testimony the first time you saw any of these

23  documents was after the restaurant closed?

24  A.  Beg your pardon?

25  Q.  Is it your testimony that the first time you saw any of

1  these documents was after Pasta and Risotto had closed?

2  A.  I've seen similar documents.  If you're asking me about

3  this specific one, I would say, yes, after the business closed.

4  Q.  Were you aware of similar documents being maintained at

5  Pasta and Risotto when it was open?

6  A.  When it was open?

7  Q.  Yes.

8  A.  I'm assuming yes.

9  Q.  Well, I don't want you to assume.  Were you aware that the

10  staff at Pasta and Risotto was maintaining documents that

11  looked like this, back when it was open?

12  A.  Yes.

13  Q.  How do you know that?

14  A.  Again, the standard operating procedures of all the

15  restaurants, they have to keep their own records.

16  Q.  Isn't it true that you know that because you've seen it,

17  that you've seen people at Pasta and Risotto preparing these

18  documents, and that they presented them to you?

19  A.  No.

20  Q.  No?

21         THE COURT:  Let me just make sure I understand.  So

22  this type of document, not this document, did you ever see this

23  type of document for the Pasta and Risotto restaurant while it

24  was open?

25         THE WITNESS:  No.

1       THE COURT:  Okay.

2   BY MR. MULHOLLAND:

3   Q.  Why was it that after the restaurant closed, you became the

4   point of contact for Ms. Mukhina to get her late payments?

5   A.  The manager, Vajna, directed her to me.

6           THE COURT:  The manager?

7           THE WITNESS:  The manager, Vajna, directed her to me.

8           THE COURT:  Oh, "Vajna" is Vajna?

9           THE WITNESS:  Correct.

10  A.  Directed her to me.

11  Q.  Why is that?

12  A.  Because I would do the right thing.

13  Q.  And Vajna wouldn't do the right thing?

14  A.  The business was closed.  I'm assuming Vajna did not do the

15  right thing, by not paying her.  If there were five people

16  working there and only one is not paid, obviously the manager

17  did not do the right thing.

18  Q.  What happened to Vajna when the restaurant closed?

19  A.  Like all of the employees, she was not working for us

20  anymore.

21  Q.  That's because she was indeed a employee?

22  A.  Beg your pardon?

23  Q.  Isn't it true that the reason Vajna directed Ms. Mukhina to

24  you is because she was a fellow employee along with

25  Ms. Mukhina?

1    A.   See, I don't know what the legal definition of "employee"

2    to you is, but, as a general definition, the person who's

3    running the restaurant after the restaurant closes down is not

4    running the restaurant anymore, whatever that means.

5             THE COURT:  So Vajna wasn't working for the restaurant

6    after it closed, right?

7             THE WITNESS:  Yes.

8             THE COURT:  She had no more responsibilities at the

9    restaurant?

10             THE WITNESS:  Yes.

11             THE COURT:  Okay.

12   Q.   Is it your contention that the general managers are

13   responsible for everything that happens when the restaurant is

14   running but the owner, you, was responsible all the time --

15   withdrawn, withdrawn.

16             Was there a general manager at Pasta and Risotto?

17   A.   Yes.

18   Q.   I'd like to direct your attention you to page 8 of your

19   deposition.  I'd like to read from page 8, lines 2 to 5, if I

20   could:

21   "Q.   So how did the general managers get their jobs at Pasta

22   and Risotto?

23   "A.   There was no general manager in Pasta and Risotto."

24             What happened?

25   A.   The reference to context here is "Do you have a general

1   manager in an 18-seater restaurant?"  No.

2                   THE COURT:  In an 18-seater restaurant?

3   A.  No.

4   Q.  You just told the jury that there was a general manager at

5   Pasta and Risotto, yet in April you told me that there was no

6   general manager in Pasta and Risotto.

7   A.  The general manager was overlooking all the businesses.  I

8   mean, maybe -- English is not my first language, so, you know,

9   I'm not coming across properly, but let me explain again how we

10  worked --

11  Q.  That's okay, sir.

12  A.  Yeah.

13  Q.  Isn't it true that you hired Mr. Montoya?

14  A.  No.

15  Q.  How did Mr. Montoya get his job at Pasta and Risotto?

16  A.  We bought a business in New Jersey called Radicchio, and

17  Mr. Montoya was working there as a cook.

18  Q.  So when you say "we," does the "we" include yourself?

19  A.  Me and my partners.

20  Q.  Yes.  So how did Mr. Montoya show up to work one day at

21  Pasta and Risotto and start preparing food?

22  A.  Could you clarify?

23  Q.  Yes.  Isn't it true that you hired Mr. Montoya to work at

24  Pasta and Risotto?

25  A.  No.

1  Q.  Isn't it true that you invited him to come and be a chef at

2  Pasta and Risotto?

3  A.  He was already working for us.  I mean, working for the

4  group.

5  Q.  Okay.  So what you're saying is, because Mr. Montoya was

6  working at a restaurant in New Jersey that you purchased, he

7  was quote-unquote already working for you?

8  A.  He was working for the group, for the business.

9  Q.  In New Jersey, right?

10  A.  Yes.

11  Q.  So how did he get from New Jersey to New York, if not for

12  your invitation?

13  A.  I am -- if I remember correctly, the general manager at the

14  time, Vivek Deora, was given the responsibility to set up NYC

15  Pasta and Risotto.  And he was the one who put the deal

16  together, including Mr. Montoya.

17          THE COURT:  Just so you know, you have 31 minutes

18  left, total.

19          MR. MULHOLLAND:  Thirty-one minutes?  Thank you.

20  BY MR. MULHOLLAND:

21  Q.  So is it your testimony you never asked -- you never

22  personally asked -- Mr. Montoya to go from New Jersey to the

23  Manhattan location?

24  A.  We may have had a general conversation, but I'm not sure,

25  you know, a general conversation would -- would -- what would

1    that mean.  We talk all the time.  He's a chef.  I'm from the

2    kitchen as well; I'm a chef too.  So we talk about food all the

3    time.

4              THE COURT:  I'm sorry, I misspoke.  At 10:42, you had

5    31 minutes left, so you have 17 minutes left now.

6              MR. MULHOLLAND:  Okay.

7              No further questions.  Thank you, your Honor.

8              Thanks for your time.

9              THE WITNESS:  Thank you.

10   CROSS-EXAMINATION

11   BY MR. LEHMAN:

12   Q.  Hi, Mr. Sharma.

13   A.  Hi.

14   Q.  Would you explain, to me and to the jury and to the judge,

15   how your investments work?  And please speak slowly and loudly

16   for everyone.

17   A.  So I went to school.  I was a chef by profession, so that's

18   how I got into this business.  So we got first place in 2002.

19   And after that, what happened was, times were good, we would --

20   brokers and other people would get offers to us for places.  So

21   we would buy a restaurant, you know.  The CPA and the attorneys

22   would go to work, they would set up an entity that would run

23   the show.  We had a management people that would basically take

24   care of everything when it came to the operating of all of

25   these businesses.

1       It was physically impossible, back in the day, when I

2   had businesses from South Jersey all the way to five businesses

3   in Manhattan, it was physically impossible for me to be at

4   every place or even visit all of them even in a week.  So we

5   had professionals who knew what to do to take care of it, but

6   those were the days.  From there, today, we are virtually down

7   to zero.

8       So we would set up a business, the deal would come to

9   us, set up a -- the CPA and the attorney would set up a

10  corporation, we would hire a management team, people who had

11  Master's in this business and people who had culinary school

12  education, people who had been doing this all their life, so

13  they would be given the responsibility as per the decision made

14  by me and my partners to run the businesses, and they would

15  take care of the businesses.  That's how all our businesses

16  were set up.

17      The perfect way to put it across is:  I'm Indian, with

18  a heavy accent, owning an Italian restaurant.  It only happens

19  in New York.  Why would I get into the Italian restaurant

20  business if it was not good investment, back in the day?  It

21  was a 16-/17-year-old Italian restaurant, opened by an older

22  Italian gentleman, Aldo Ciopolotte, who was retiring.

23  Q.  Just slow down.

24  A.  It was a 16-/17-year-old Italian restaurant in New Jersey,

25  owned by an older Italian, older Italian gentleman, Aldo

1    Ciopolotte, who was retiring.  So a broker and a mutual friend,

2    attorney, approached us that, you're in the business of

3    investing into restaurants, would you like to add this to your

4    portfolio?  That's how I got into the Italian restaurant

5    business.

6    Q.  Do you remember when you purchased Radicchio?

7    A.  2009 or '10, '8 or '9, I think so.

8    Q.  Did you, as I'm saying, purchase it alone or --

9    A.  No, no.  See, I was -- yeah, we had partners.

10   Q.  I know you want to tell your story.

11        Who did you purchase it with?

12   A.  Ajit Bains.

13   Q.  Did you purchase it or did you set up an LLC?

14   A.  We set up a company.

15   Q.  Did you set up companies for all your investments?

16   A.  Yes.

17   Q.  So then let's focus on the restaurant here.  Who was

18   responsible for everything that happened in the restaurant?

19   A.  The company.

20   Q.  The company was responsible?

21        Was there any individual person who you, through the

22   LLC, hired to be responsible for that restaurant?

23   A.  The LLC had the general manager; the general manager had

24   the manager; the manager running the show was --

25        THE COURT:  Wait.  Can you just speak more slowly?

1    The LLC had a general manager.  So that general manager was for

2    all of the restaurants?

3              THE WITNESS:  Yes.

4    BY MR. LEHMAN:

5    Q.  What was his or her name?

6    A.  Vivek Deora, V-i-v-e-k D-e-o-r-a.

7    Q.  That's the first and last name?

8    A.  Yes, that's correct.

9    Q.  Who was underneath that general manager who was overseeing

10   all the investments?  Was there someone else in each business?

11   A.  Yes.

12   Q.  Who was that?  Or what was their title?

13   A.  The restaurant manager.

14   Q.  Was there a restaurant manager at Radicchio on 53rd Street?

15   A.  Yes.

16   Q.  Who was that?

17   A.  There were a few, but when we closed, the last manager was

18   Vanja Bojic.

19   Q.  Could you please spell that?

20   A.  V-a-n-j-a B-o-j-i-c.  I think so.

21   Q.  Did you hire anyone else to help with -- well, did you hire

22   anyone, or did the LLC hire people?

23   A.  We would set up a business, set up a corporation.  The GM

24   and the group executive chef, you know, were given the

25   authority by me and Ajit, whoever the partner was, because we

 1  had different partners in different businesses, and they would

 2  run with it, they would take care of everything else.

 3  Q.  Do you have the deposition that Mr. Mulholland handed to

 4  you in front of you?

 5  A.  Yes.

 6  Q.  Could you please turn to page --

 7          THE COURT:  No, you can't.  Only if it's an admission.

 8  He's not adverse to himself.  He can't --

 9          MR. LEHMAN:  I'm not asking for it to be admitted.

10  I'm asking him to use it to refresh his recollection of what he

11  spoke at --

12          THE COURT:  He hasn't said he doesn't recall.

13  BY MR. LEHMAN:

14  Q.  Do you recall everything that you said at the deposition?

15          THE COURT:  No.  We need a precise question that he

16  doesn't recall, and then, in that case, you could have him

17  refresh it.

18  BY MR. LEHMAN:

19  Q.  Do you recall saying --

20          THE COURT:  No.

21          MR. LEHMAN:  I just want --

22          THE COURT:  It's hearsay.  He's on the stand.  You can

23  ask him a question directly but only an --

24  Q.  Do you remember after -- you said, as an owner, I would

25  say, yes, do you remember the sentences that you said right

 1    after that during the deposition?

 2                THE COURT:  No.

 3                MR. LEHMAN:  I'll move on.  I don't --

 4                THE COURT:  Just ask him the question.  Not about the

 5    deposition.  Ask him whatever the factual question is.

 6    BY MR. LEHMAN:

 7    Q.  During the deposition, did you ever --

 8                THE COURT:  No, not during the deposition.  About the

 9    restaurant.

10                MR. LEHMAN:  I appreciate Mr. Mulholland not

11    guffawing.

12    Q.  Do you know who Vajna Bojic is?

13    A.  The manager of Radicchio Pasta and Risotto.

14    Q.  What were her responsibilities managing?

15    A.  To take care of everything in the restaurant.

16    Q.  Did she have the authority to sign checks?

17    A.  Yes.

18    Q.  Do you remember if she ever filled out checks?

19    A.  Yes.

20    Q.  Why would she fill out checks?

21    A.  Because she was running the show.

22    Q.  I'm sorry, I couldn't hear you.

23    A.  Because she was running the show.  She had the authority to

24    do everything in that specific unit.

25    Q.  How often did you visit the restaurant on 53rd Street?

1    A.  Once a week maybe, maybe twice.

2    Q.  How much total interaction did you have, over four years,

3    with the plaintiff, who is --

4    A.  If I had to add it all, put together, probably maybe two

5    hours, put together, between all the time that I owned that

6    business.

7    Q.  Is that for each individual plaintiff?

8    A.  Both of them put together.

9    Q.  Do you mean face-to-face time, or are you including text

10   time?

11   A.  Just interaction while the business was open.  I would say

12   there was more interaction after the business closed than

13   during the business open.

14   Q.  You had more what?

15   A.  More -- she would have texted me after the business closed,

16   but my interaction with her during the business was virtually

17   zero, because I was never there.

18   Q.  So after the business closed, something happened?

19   A.  After the business closed, she approached me, asking me

20   about not being paid.

21   Q.  Not being paid by who?

22   A.  By the restaurant.

23   Q.  By the restaurant?

24           Did you feel as if you had any legal obligation to

25   personally pay her?

1    A.   The business -- the business has to pay her.  That's,

2    that's, you know, the business has to pay her.  She's owed;

3    she's got to be paid by the business.

4    Q.   So do you believe that the business owed her money when it

5    closed?

6    A.   I have no reason to feel she is lying; yes.

7    Q.   So you believe that the business owed her money after it

8    closed?

9    A.   Yes.

10    Q.   Would you like her to receive that money?

11    A.   Yes.

12    Q.   Do you know how much money she's asked from you?

13            MR. MULHOLLAND:  Objection.

14            THE COURT:  Sustained.

15    Q.   Would you like -- well, let me repeat the question.

16            Would you like her to receive the money that she is

17    owed by the business?

18    A.   Yes.

19    Q.   So why haven't you found a way for her to get that money?

20    A.   I was trying to do that after the business closed, but they

21    ended up suing me.  I have lost my shirt after that.  I paid a

22    even lot more in legal fees than what I actually owed her.  In

23    fact, I tried telling her that, I'd rather pay the money to

24    you, than throw it into legal fees, but she refused to talk to

25    me.

I97KFLO2                          Sharma - Cross

1   Q.  Well, how much personal debt do you have right now?

2           MR. MULHOLLAND:  Objection; relevance.

3           MR. LEHMAN:  Whether or not he could pay her.

4           THE COURT:  Sustained, sustained.

5   Q.  Sitting here today, would you still like to find a way for

6   her to get the money that she is owed?

7   A.  Yes.

8   Q.  Did you ever have any interaction with the other plaintiff?

9   A.  No.  In fact, I had to put a face to the name.  And I asked

10  Danny, sitting there, is this the gentleman, because, you know,

11  as I said, my total interaction -- if anybody had seen that

12  restaurant, I'm a big guy, so is Danny, both of us standing in

13  that restaurant, nobody can move.  So it was physically

14  impossible for me to even stand in that restaurant.  All the

15  more reason for me not to be there.

16          THE COURT:  I'm sorry, why couldn't you stand in the

17  restaurant?

18          THE WITNESS:  It was so small, your Honor.  If both of

19  us fat guys stand there, we basically block the whole place,

20  nobody could get in and out.

21          THE COURT:  I see.  Thank you.

22  Q.  How many seats were in the restaurant?

23  A.  Eighteen.

24  Q.  Are you able to physically describe how big it was, using

25  items in the courtroom?

I97KFLO2                          Sharma - Cross

 1   A.  The size?  This size.

 2   Q.  By that, you are pointing to the jury box?

 3   A.  Yes, the jury box.  That was the size of the restaurant.

 4   Q.  Do you remember whether or not Ms. Mukhina ever texted you

 5   a picture of something entitled "Payroll"?

 6   A.  Yes.

 7   Q.  Did she do that before or after the restaurant closed?

 8   A.  After the restaurant closed.

 9   Q.  Do you remember if she ever texted you that Vajna Bojic was

10   her friend?

11   A.  Yes.

12   Q.  What else did she say in that text message, if you

13   remember?

14             MR. MULHOLLAND:  Objection; hearsay.

15             THE COURT:  I'll allow it.

16   A.  My immediate reaction was that, you know, the managers have

17   to be responsible.  And her reaction was, Vajna is my friend,

18   please do not talk to her.

19   Q.  What was the last part?

20   A.  Vajna is my friend, please do not talk to her.

21             I would ask one thing in --

22   Q.  No, don't ask.

23   A.  Sorry.

24   Q.  Did you hire either plaintiff?

25   A.  No.

I97KFLO2                         Sharma - Cross

1    Q.  Did you have the power to fire either plaintiff?

2    A.  No.

3    Q.  Why didn't you have the power?

4    A.  As I told you, the way we set up these businesses, we would

5    set up a company, we would empower the general manager and the

6    group executive chef to take care of everything from there on.

7    So I was -- it was not in my hands.  Legally, it was not -- I

8    was not allowed do that.  I have to go back to my partner,

9    Ajit, before I did anything.

10   Q.  Have you ever said that you had the power to hire someone?

11   A.  As a general conversation, maybe, but no.

12   Q.  Did you ever set the schedules?

13   A.  No.

14   Q.  Did you determine the pay rate of each plaintiff --

15   A.  No.

16   Q.  -- or any employee of the restaurant?

17   A.  No.

18   Q.  Did you ever direct them how to clean the place?

19   A.  No.

20   Q.  Did you ever direct them how to interact with customers?

21   A.  No.

22   Q.  Did you ever determine anything with regard to their

23   workplace conditions?

24   A.  No.

25   Q.  Did you ever make any suggestion to them about the

1   workplace conditions?

2   A.  Not that I remember, no.

3   Q.  Did you know how much any employee got paid per hour?

4   A.  No.

5   Q.  Did you know if any employee had a salary?

6   A.  No.

7   Q.  Do you know where the records for the company are?

8   A.  For NYC Pasta?  No.

9   Q.  Yes, for the restaurant.

10  A.  No.  In fact, the restaurant was closed down by Valeriya

11  and Vajna, and I have not been able -- I didn't know two years

12  later I'd get sued.  When I asked where the records were,

13  everything was put into the storage.  That's what I was told.

14  That's what I told the attorney as well.

15  Q.  So you tried to find these records?

16  A.  I did.

17  Q.  What date was the store closed on?

18  A.  I believe 15th of August, 2015.

19  Q.  And who closed the restaurant?  Who wrapped it all up?

20  A.  Valeriya, Vajna.

21          THE COURT:  Who and Vajna?

22          THE WITNESS:  Valeriya and Vajna.

23          MR. LEHMAN:  The plaintiff and Vajna.

24  Q.  Again, why did you leave checks with your signatures on

25  them at work?

1    A.  Because I wanted to do the right thing.  If -- I am one of

2    the signers.  If the general manager is not there, if the

3    manager is not there, you know, I would be asked by the

4    accountant -- in fact, I'll give you the name, Ganesh, who was

5    also part of it -- he would tell me as a backup, you know,

6    could you just go and drop or sign a few checks there.  And I'd

7    do that.

8    Q.  Did you ever give Ms. Mukhina blank checks -- did you ever

9    give her blank checks at any point in time?

10   A.  Yes.

11   Q.  When did you give those to her?

12   A.  After the business closed.

13   Q.  Why would you give blank checks to her?

14   A.  So when it was brought to my knowledge that the business

15   owed her money, I went back to my partner and informed him

16   that, you know, there is one employee who is owed money.  To

17   date, I was not given the records by Vajna or anybody else.

18   I'm going 100 percent by what she said.

19           So I, as I said, I asked Ganesh to reconcile it,

20   because I did not know, I did not have access, I did not keep

21   any of the records.  So whatever she would message me, I'd say,

22   okay, you know what, I believe you 100 percent, what is owed to

23   you.  I went back to my partner and said, listen, the business

24   is closed, the bank is closed, what do we do, we've got to take

25   care of these people.  So, you know, we took a decision that

1   instead of her having to look for me chase anybody, you know,

2   we left.  In fact, I did not even meet her.  I just left an

3   envelope with a whole bunch of blank checks, telling her that,

4   listen, I'd speak to my partner, arrange the money, and take

5   care of whatever is -- whatever the business owes you.

6          So by doing the right thing, I feel I'm being punished

7   because I was a nice guy.

8   Q.  But let's not...

9          Why didn't you just authorize her to fill out the

10  check for the exact amount that she was owed by the restaurant?

11  A.  Beg your pardon?

12  Q.  Why didn't you just say, pay yourself everything that

13  you're owed by the restaurant?  She had blank checks.

14  A.  I should have the money to tell her to do that.  I'd love

15  to do that.  If I would have had the money, I would say, write

16  it down and finish it, just close the chapter.

17  Q.  So it was impossible for pay her?

18  A.  Yes.

19  Q.  The money owed by the restaurant?

20  A.  Yes.

21  Q.  Did the plaintiff, prior -- the other plaintiff,

22  Mr. Carrasco, did he, prior to the lawsuit, ever claim that you

23  owed him any money?

24  A.  Never.  In fact, even --

25  Q.  Did any other employee from this restaurant ever come to

1   you and say, you owe me money, I didn't get paid?

2   A.  No.

3   Q.  Do you know if anyone directed Ms. Mukhina to contact you?

4   A.  Vajna.

5   Q.  I'm sorry?

6   A.  Vajna.

7   Q.  Vajna?

8   A.  Let me clarify one thing:  When Radicchio had closed, there

9   were a couple of other employees who were owed a couple of

10  checks, and Vajna had informed me that she is taking care of

11  that.  And I am believing they were all taken care of it

12  because I did not hear of it from Vajna or the GM after that.

13  So I'm assuming that it was all done.

14          In fact, let me clarify:  I think I'm certain it was

15  all done, because after this whole fiasco started, I asked, I

16  checked, and I don't think there's anybody who was working

17  there that's owed money.

18  Q.  Did you instruct anyone to make sure that the LLC was

19  following the law?

20  A.  The general manager.

21  Q.  Whose name was?

22  A.  Vivek Deora.

23  Q.  Was it important to you that he follow the law?

24  A.  Yes.

25  Q.  Why was it important to you that he follow the law?

1   A.  Because the same law firm had sued me once before.  And,

2   you know, that's -- in fact, I even went and met Mr. Michael

3   Faillace and thanked him.  Because of him, I got the whole

4   house in order and did whatever he expected me to do, when I

5   had paid him a big settlement the very first time he came after

6   me.

7   Q.  Were you surprised to find out that the restaurant, the

8   company, was not following the law?

9   A.  Yes.

10  Q.  Do you want all your companies to follow the law?

11          THE COURT:  The only issue that's still for the jury

12  is the issue of whether he was an employer.  So I think we're

13  getting a little far afield.  The willfulness issue is not in

14  anymore.  So please move on.

15  Q.  Do you speak Spanish?

16  A.  No.

17  Q.  If you wanted to communicate with the other plaintiff,

18  would it be possible for to you communicate with him?

19  A.  No.

20          MR. LEHMAN:  No more questions, your Honor.

21          THE COURT:  All right.

22          Anything more?

23          MR. MULHOLLAND:  Very briefly.

24          THE COURT:  All right.

25

1    REDIRECT EXAMINATION

2    BY MR. MULHOLLAND:

3    Q.  So, Mr. Sharma, it's fair to say that there were other

4    employees who approached you about back pay; isn't that

5    correct?

6    A.  No.

7    Q.  No?  So Natalia Kokovaya never approached you about money

8    that the business owed her?

9    A.  Vajna had told me about a couple of other employees, and

10   Vajna told me she took care of it.

11   Q.  What about Alina Zulina?

12   A.  As I said, the name rings a bell, but, as I told you, Vajna

13   told me she took care of everything when the business was

14   closed.

15   Q.  It sounded like -- when your attorney was asking you

16   questions, it sounded like you were again saying you didn't

17   have the power to hire and fire anyone at Pasta and Risotto.

18   Is that true?

19   A.  Yes.

20   Q.  But didn't we just go over that?  Wasn't that the first

21   question I asked you in my examination, and we saw that you

22   indeed have the power to hire and fire, as you told me in your

23   deposition?

24   A.  I had the power to hire the general manager.  I had the

25   power to set up a business.  I had the power to empower the

1  general manager and the group executive chef to run the

2  businesses, hire and fire people at the restaurant level.  I

3  also said it was physically impossible for me to be running so

4  many businesses.  I did not even know the name of 99 percent of

5  my employees, because there were so many of them.

6  Q.  Okay.  So you had the power to hire and fire people at

7  Pasta and Risotto; that's not an issue anymore?

8  A.  No, no.

9  Q.  No?

10  A.  No.

11  Q.  Okay.  So let's turn to page 66 for a second time, in your

12  deposition.  Line 4:  "Again, as an owner of Pasta and Risotto,

13  did you have the power to fire any of these managers?

14  "A.  As an owner of Pasta and Risotto, did I have the power?

15  "Q.  Yes.

16  "A.  As an owner, I would say yes."

17  A.  The general manager.

18  Q.  Why don't we turn to page 7 of your deposition.

19  A.  They have themselves said I do not hire --

20             THE COURT:  There is no question.

21             THE WITNESS:  Sorry.

22  Q.  Why don't you turn to page 7.

23  A.  Page?

24  Q.  Page 7.

25             Question at line 5:

I97KFLO2

1    "Q.  Did you hire the management team?

2    "A.  Good question.  I mean, I'm trying to remember.  A lot of

3    them are alone through references or whatever, so, yeah."

4             That sounds --

5    A.  The management team, the general manager and the group

6    executive chef.

7    Q.  If you could turn to page 19 of your deposition.

8             MR. MULHOLLAND:  Withdrawn, withdrawn.

9             No further questions, your Honor.

10            THE COURT:  Okay.

11            You may be excused.

12            (Witness excused)

13            THE COURT:  Do you have another witness,

14   Mr. Mulholland?

15            MR. MULHOLLAND:  No, your Honor.  Plaintiff rests.

16            THE COURT:  You rest?

17            MR. MULHOLLAND:  Yes.

18            THE COURT:  Okay.

19            Defense case?

20            MR. LEHMAN:  Yes.

21            I'd like to call Mr. Montoya.

22            THE COURT:  Okay.

23            MR. LEHMAN:  Your Honor, Mr. Montoya speaks Spanish.

24            THE COURT:  All right.  Where is the interpreter?

25            MR. MULHOLLAND:  These are plaintiffs' interpreters.

I97KFLO2

1    These are plaintiffs' interpreters.  I hired them to take care

2    of Mr. --

3              THE COURT:  Ah.  Well, why don't we go ahead and use

4    the interpreter.  That way, your client can understand as well,

5    but we will be able to also.

6              MR. MULHOLLAND:  Sure.

7              THE COURT:  If you want to send Mr. Lehman a small

8    bill for a few minutes of interpreter time, I'm sure he'd be

9    happy to pay it.

10    FELIX D. MONTOYA,

11         called as a witness by the Defendants,

12         having been duly sworn, testified through the

13         Spanish interpreter as follows:

14              THE COURT:  We've already sworn this interpreter, or

15    no?

16              THE DEPUTY CLERK:  No.

17              THE INTERPRETER:  Yes.

18              THE COURT:  You can do it again.

19              THE DEPUTY CLERK:  Actually, she's good.

20              THE COURT:  You interpreted two days ago?

21              THE INTERPRETER:  Yes, I did.

22              THE COURT:  Okay.  Thank you.

23              THE DEPUTY CLERK:  Just state your first and last

24    name, please.

25              THE WITNESS:  My name is Felix D. Montoya.

I97KFLO2                    Montoya - Direct

1   DIRECT EXAMINATION

2   BY MR. LEHMAN:

3   Q.  Hello, Mr. Montoya.

4   A.  Hello.

5   Q.  Do you know of a restaurant named Radicchio?

6   A.  Yes.

7   Q.  Are there more than one restaurants named Radicchio?

8   A.  Yes.

9   Q.  Have you ever worked for a restaurant named Radicchio?

10  A.  Yes.

11  Q.  When did you start working for that restaurant?

12  A.  1995.

13  Q.  Where was that restaurant located?

14  A.  34 Franklin Avenue, New Jersey, Ridgewood.

15  Q.  Did you ever work at another restaurant named Radicchio?

16  A.  Yes.

17  Q.  Where was that restaurant located?

18  A.  53rd Street in Manhattan.

19  Q.  When did you start working for that restaurant?

20  A.  I'm not sure; 2009, 2010.

21  Q.  When did you stop working for that restaurant?

22  A.  When it was closed.

23  Q.  Do you know if there was anyone in charge of the restaurant

24  on 53rd Street?

25  A.  Yes; the managers.

1   Q.  Who was the last manager that you had?

2   A.  The manager, Vajna.

3   Q.  Who would pay you at the restaurant?

4   A.  The managers.

5   Q.  Did Vajna ever pay you?

6   A.  Yes.

7   Q.  Did you ever see any records at the restaurant?

8   A.  I'm not sure.

9   Q.  Did you ever see anywhere any records that belonged to the

10  restaurant?

11  A.  Records?

12  Q.  Payroll records.

13  A.  No.

14  Q.  Did you ever set the schedule for the plaintiff

15  Mr. Carrasco?

16  A.  No.

17  Q.  Did you ever give him his schedule?

18  A.  Yes.

19  Q.  Why did you give him the schedule?

20  A.  I understand a little bit more English than he does.

21  Q.  So why does that matter?

22  A.  Because the other people there only spoke English and he

23  spoke Spanish.

24  Q.  Did you ever determine the pay of him?

25  A.  No.

1    Q.  Did you ever determine the pay of the other plaintiff?

2    A.  No.

3    Q.  Did you ever set her schedule?

4    A.  No.

5    Q.  Did you hire either of them?

6    A.  No.

7    Q.  With regard to Mr. Carrasco, did you ever discipline him?

8    A.  Yes.

9    Q.  Did you ever tell him to clean up?

10   A.  Yes.

11   Q.  Why did you tell him to clean up?

12   A.  First of all, because we had to keep everything clean and

13   in order, because the Health Department could show up at any

14   time.  Cleaning is a routine, so you have to be on top of

15   people, saying things like, don't do that, don't put that

16   there, put this here, put this over there, do not mix the old

17   stuff with the new stuff, you should cut this at this time, not

18   at that time.

19           And the most important thing was the cell phone.  And,

20   you know, people want to be on the phone all the time -- and

21   not only him, the dishwashers, the other cook -- so we had to

22   have a routine, and I set the example, I turned off my phone,

23   and that is the way I did, that is discipline, because the

24   biggest challenge for me was to be a grade A from the Health

25   Department.

1   Q.  Why do you care?

2              THE COURT:  Why do you care?

3              MR. LEHMAN:  He cares because he's the employer or

4   designated manager --

5              THE COURT:  No.  Let's move on.  Ask another question.

6              MR. LEHMAN:  I understand, your Honor.  I'm pausing.

7   Q.  How often did you see Mr. Sharma at the restaurant that we

8   were talking about on 53rd Street?

9   A.  Sometimes I would see him once a week, maybe sometimes

10  twice a week.

11  Q.  Did Mr. Sharma ever hand you a check for payment?

12  A.  After we closed, yes.

13  Q.  Before you closed, did he ever hand you a check?

14  A.  No.  It was the managers.

15  Q.  Who was the last person, before it closed, that handed you

16  a check?

17  A.  The manager, Vajna.

18  Q.  Were you always paid in checks?

19  A.  Yes.

20             MR. LEHMAN:  No more questions, your Honor.

21             THE COURT:  Okay.

22             Cross?

23             MR. MULHOLLAND:  Yes.  Thank you, your Honor.

24

25

1    CROSS-EXAMINATION

2    BY MR. MULHOLLAND:

3    Q.  Mr. Montoya, isn't it true that it was Mr. Sharma who

4    invited you to move from the New Jersey Radicchio to the

5    Manhattan Radicchio?

6    A.  I'm not sure.  I do remember that there was a meeting,

7    Vivek was there, and the executive chef -- what was his name --

8    I always get his name confused, Pravin, and Mr. Sharma.

9    Q.  Is it fair to say that Mr. Sharma was in control of the

10   Manhattan Radicchio Pasta?

11   A.  In my opinion, no.  That's why we didn't last.

12          MR. MULHOLLAND:  I'd like to hand the witness a copy

13   of his deposition from May 15th.  If we could turn to page 16.

14          THE INTERPRETER:  I'm sorry, I didn't hear that.

15          THE COURT:  Does Mr. Lehman have a copy as well?

16          MR. MULHOLLAND:  Yes.

17   Q.  If we could turn to page 16.

18          MR. MULHOLLAND:  Could the translator translate lines

19   13 through 24.

20          (Pause for translation)

21   Q.  Let me read the passage in English.  Starting on line 13.

22   "Q.  Who was the quote-unquote 'they' that asked you to work at

23   the New York restaurant?

24   "A.  Sati.

25   "Q.  Anyone else besides Sati ask you to go to New York?

I97KFLO2

1      "A.  It was just Sati, the one in New York and Vivek, because

2      they were the ones who had all the control.

3      "Q.  Did Sati control the New York restaurant?

4      "A.  Are you asking me did he control it?  I would imagine so,

5      yes."

6              THE COURT:  You're entitled to just read that into the

7      record, or you can ask him a question about it, either one.

8              MR. MULHOLLAND:  Sure.

9      BY MR. MULHOLLAND:

10     Q.  Is there any reason why your testimony changed from May of

11     2018 to today, regarding whether Sati controlled the restaurant

12     and whether Sati invited you to the New York restaurant?

13     A.  I think that if he had had or been in more control, we

14     would not have had to close, but...

15     Q.  But what?

16     A.  But we closed.

17     Q.  Okay.

18             THE COURT:  You have nine minutes.

19             MR. MULHOLLAND:  Okay.

20             No further questions, your Honor.  Thank you.

21             THE COURT:  You may step down.  Thank you.

22             (Witness excused)

23             THE COURT:  Any further witnesses?  Does the defense

24     rest?

25             MR. LEHMAN:  Yes, your Honor.

1            THE COURT:  All right.

2            Why don't we take a short break.  Then I think we'll

3      instruct the jury.

4            JUROR:  I have a question, but I don't have paper.

5            THE COURT:  Oh, okay.  A question for one of the

6      witnesses or just for me?

7            JUROR:  I --

8            THE COURT:  It doesn't matter.  We'll give you a piece

9      of paper, and you can ask it.

10           JUROR:  Okay.  Thank you.

11           THE DEPUTY CLERK:  Anyone else?

12           JUROR:  A piece of paper.

13           THE DEPUTY CLERK:  Okay.

14           (Pause)

15           THE COURT:  Okay.  There are two questions, and

16     they're questions for Mr. Montoya.  I think I know the answer,

17     but I don't give evidence, so if it's okay, why don't we just

18     have Mr. Montoya answer those two questions.  But, actually, I

19     should tell the lawyers what they are first, so let me meet the

20     lawyers at the sidebar with the reporter.  I'll tell you the

21     two questions, and then I'll ask Mr. Montoya.

22           (Continued on next page)

23

24

25

I97KFLO2

1          (At the sidebar)

2          THE COURT:  So the question is:  Were there other

3    chefs above Mr. Montoya?

4          And the other question is:  Was he considered the

5    executive chef or just an employee?

6          I would leave out the "or just an employee" part of

7    the question.  I would ask the other two questions just because

8    I think there's a lack of clarity about the executive chef

9    versus chefs in the various restaurants.

10         MR. LEHMAN:  That's --

11         MR. MULHOLLAND:  That's fine.

12         THE COURT:  All right.  Thank you.

13         (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

I97KFLO2

1          (In open court)

2          THE COURT:  Mr. Montoya, we have just a couple of

3   questions.  You don't have to come back up here if you don't

4   want.  You can stand there and answer them, if you don't mind.

5          MR. LEHMAN:  He doesn't speak English.

6          THE COURT:  I know.  Actually, he speaks more English

7   than Mr. Carrasco, so he may have understood that.

8          The first is:  Were there other chefs above you or who

9   were your boss?

10         THE WITNESS:  Yes.

11         THE COURT:  Who was that?

12         THE WITNESS:  Pravin.

13         THE COURT:  Was he the executive chef?

14         THE WITNESS:  (In English)  Yes.

15         (Through Interpreter)  Yes, he was the executive chef.

16         THE COURT:  So he was the executive chef over all of

17  the restaurants in the group?

18         THE WITNESS:  Yes.

19         THE COURT:  And you worked only in the restaurant on

20  53rd Street; is that right?

21         THE WITNESS:  Yes.

22         THE COURT:  Were there any other chefs who worked at

23  the restaurant at 53rd Street?

24         THE WITNESS:  Yes; one.

25         THE COURT:  Was he your equal, or was he your boss, or

I97KFLO2

1   were you his boss?

2            THE  WITNESS:  He was my --

3            THE  INTERPRETER:  I can't remember.

4            THE  WITNESS:  -- the subordinate.

5            THE  COURT:  All right.  Thank you.

6            THE  WITNESS:  (In English)  You're welcome.

7            THE  COURT:  Now we can take our break, probably about

8   ten minutes.

9            We've also ordered food for you for lunch.  It's

10  probably not there yet, but the plan is for me to give you the

11  final instructions, and then we'll have brief closing

12  arguments, and then you'll deliberate.

13           Okay?  So let's take our break.

14           (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

I97AAFLO3

1          THE COURT:  So we need to have a quick discussion

2    about the charge and about the verdict form but we probably all

3    need a little break.  So, which did you want to do first?

4          MR. MULHOLLAND:  I would ask to take a break first.

5          THE COURT:  Let's do this.  Why don't we, I think

6    we've given you copies of the charge and basically, all I did

7    was take out the part about "willfulness" and any reference to

8    there being two issues.  The only changes are within the last

9    two pages.  I took all the "willfulness" out.  Then when we

10   come back we could talk about it.

11         I'll also warn you I already have copies of all these

12   made.  If there are any corrections we'll likely have to do it

13   in ink because I've already made copies because it takes a

14   while to do that.

15         Let's adjourn for ten minutes and then we'll come back

16   and have a chat.

17         (Recess)

18         THE COURT:  Please be seated.

19         Are there any comments with regard to the charge?

20         MR. MULHOLLAND:  No, your Honor.

21         MR. LEHMAN:  No points, your Honor.

22         THE COURT:  OK.  The verdict form.  I got Mr. Lehman's

23   e-mail yesterday and we've eliminated the "either" or "both"

24   language that he thought was potentially confusing because it's

25   not relevant any more.  He had requested that I include the

I97AAFLO3

1     "burden of proof" in the questions and I won't do that.  But

2     what I will do is first of all in the instruction I have

3     included it.  And second, when I go over the verdict form I

4     will remind them when it says "has the plaintiff Carrasco

5     shown", in each case that means "shown by a preponderance of

6     the evidence".

7                 Any comments on the verdict form?  Any other comments

8     on the verdict form?

9                 MR. LEHMAN:  Your Honor, I just need to address one

10    thing for the record perhaps on appeal.  I asked counsel for

11    the original checks he said as a courtesy he would give them to

12    me and now he has declined to do so.

13                MR. MULHOLLAND:  I suppose to make sure the record on

14    appeal clear, I asked my client to bring the checks both on the

15    first day of trial and today.  She did.  The first time

16    Mr. Lehman reached out to me to ask to examine them was

17    literally one minute ago.  I think since both cases are closed

18    it's not really prudent.  Well, my client doesn't have to her

19    personal property at this point.  They were available.  It was

20    never asked.

21                THE COURT:  OK.  Thank you.

22                All right.  So why don't we put a copy of the

23    instructions on each of the jurors' chairs, just the

24    instructions on the verdict sheet.

25                (Pause)

I97AAFLO3

1           MR. LEHMAN:  May I ask a question?

2           THE COURT:  How long do each of you want?

3           MR. LEHMAN:  Is it plaintiff, defendant, rebuttal by

4     plaintiff?

5           THE COURT:  I actually, leave it up to plaintiff.

6     Since plaintiff has the burden you can either go second and use

7     all your time at once or you can reserve part of your time for

8     rebuttal.

9           MR. MULHOLLAND:  I'd like to reserve a small part for

10    rebuttal.

11          THE COURT:  How much time do you think you'd need?

12          MR. LEHMAN:  Your Honor, because we were -- I am

13    particularly good about -- I don't know how many minutes I have

14    left.

15          THE COURT:  Forget the time.  For closing arguments I

16    just whatever amount of time -- we have one issue but you

17    probably want to talk about that.  So how long do you think you

18    need?

19          MR. MULHOLLAND:  Couldn't be more than 30 minutes

20    total.

21          THE COURT:  That seems long.  So 20 minutes total each

22    side.

23          MR. MULHOLLAND:  Thank you, your Honor.

24          THE COURT:  How much time do you want to reserve?

25          MR. MULHOLLAND:  Five minutes.

I97AAFLO3

1          THE COURT:  OK.  So Mr. Street, just so you know,

2     summations will be 20 minutes total each side, then the

3     plaintiff will be 15 minutes, then defendant 20 minutes and

4     plaintiff five minutes.

5          You can get the jury and I am about to charge the

6     jury.

7          (Jury present)

8          THE COURT:  You may be seated.

9          Ladies and gentlemen, I put a copy of my instructions

10    on your chairs and I'm about to read them to you.  You can

11    follow along and underline and mark things if you'd like or if

12    you're better just listening, you can put it aside and not look

13    at it but these are yours and shred them at the conclusion of

14    deliberations which you'll be able to bring them into the jury

15    room.

16         Members of the jury, you have now heard all of the

17    evidence in this case.  You are about to hear the final

18    arguments of the parties.  Then you will undertake your final

19    and most important function as jurors.  You've paid careful

20    attention to the evidence and I am confident that you will act

21    together with fairness and impartiality to reach a just

22    verdict.

23         My duty at this point is to instruct you on the law.

24    It is your duty to accept these instructions of law and apply

25    them to the facts as you determine them, just as it has been my

1    duty to preside over the trial and decide what testimony and

2    evidence was proper under the law for your consideration.  You

3    are to consider these instructions to go as a whole.  In other

4    words, you are not to isolate or give undue weight to any

5    particular instruction.

6           It is a tradition and right of your legal system that

7    parties involved in legal disputes have a jury chosen from the

8    members of the community to render a verdict.  Your role as

9    jury is to decide the factual issues in the case.  I, as the

10   judge will instruct you on the law and you must accept the law

11   as I state it to you.  Then you will apply the law to the facts

12   as you find them and the result of your work will be the

13   verdict that you return.

14          You as jurors are the sole arbiters of the facts.  You

15   determine the weight of the evidence.  You apprize the

16   credibility of witnesses.  You draw the reasonable inferences

17   from the evidence or lack of evidence and you resolve such

18   conflicts as there may be in the testimony.

19          In determining these issues no one may invade your

20   province or functions as jurors.  In order for you to determine

21   the facts, you must rely upon your own recollection of the

22   evidence.  And I'll instruct you in a minute about what is and

23   is not evidence.

24          Because you are the sole and exclusive arbiters of the

25   facts I do not mean to indicate any opinion as to the facts or

1    what your verdict should be.  The rulings I've made during the

2    trial are not any indication of my views of what your decision

3    should be.  You are expressly to understand that the Court,

4    that I have no opinion as to the verdict you should render in

5    this case.

6           My role as the judge is to instruct you on the law

7    that you are to apply to the facts as you find them.  You as

8    jurors are bound to accept my instructions even if you feel

9    that the law should be different than what I say it is.  Also,

10   if anyone states a legal principle different from any that I

11   sate to you in my instructions, it's my instructions you must

12   follow.  You should not single out any single instruction or

13   any one word or phrase in instructions as alone stating the law

14   but you should consider the instructions as a whole.

15          All parties to a civil law suit are entitled to a fair

16   trial.  Therefore, you must make fair and impartial decisions

17   in order to arrive at a just verdict.  Under your oath as

18   jurors you are to be guided solely by the evidence presented

19   during the trial or the lack of evidence, as well as the

20   applicable law without regard to your feelings, positive or

21   negative, for any party or attorney.  All parties are entitled

22   to the same fair and conscientious consideration.  If you let

23   sympathy or bias interfere with your clear thinking, then there

24   is a risk that you will not arrive at a just verdict.

25          As I have said, in determining the facts, you must

1    rely upon your own recollection of the evidence.  What is

2    evidence?  Evidence consists of the testimony of the witnesses,

3    the exhibits that have been received into evidence and any

4    stipulations.  By contrast, what counsel have said in their

5    opening statements, questions and objections, as well as what

6    they may say in their closing arguments, is not evidence.

7    Also, anything that I have said or may say about the facts, as

8    well as anything you have heard outside the courtroom is not

9    evidence.

10           I should just mention that it's not included here but

11   to the extent that either lawyer read from a deposition

12   transcript into the record and I permitted that reading, that

13   is also evidence.

14           You should bear in mind that a question put to a

15   witness is never evidence.  It is only the answer that's

16   evidence.  So at times a question may have incorporated into a

17   question a statement that assumes certain facts to be true and

18   asked the witness if the statement was true.  If the witness

19   denied the truth of the statement and if there's no direct

20   evidence in the record proving the assumed fact to be true,

21   then you may not consider it simply because it was contained in

22   a question.  You also may not consider any answer that I

23   directed you to disregard or that I directed be stricken from

24   the record.

25           Arguments made by attorneys are not evidence.  And if

your recollection of the facts differs from the statements the
attorneys may make in their closing arguments, then it is your
recollection of the facts that controls.

          During the trial I have been called on to make various
rulings.  There have been objections, motions may have been
made to strike answers or conferences may have been held.  You
should disregard these procedural matters.  They are matters of
law and although, you may have been curious about them you
should not consider them.  Objections are not evidence.
Objections are a proper part of the trial process and you
should make no inference or be influenced in any way by an
objection or by the Court's ruling on it.  Likewise, it is my
function to cut off questioning, to strike remarks and to
reprimand any person when I think it is necessary but you
should draw no inference from that.

          Also, the fact that I may have commented during the
course of the trial or asked questions of witnesses, does not
indicate any feeling of mine about the facts or credibility of
the witness.  I have no such feelings, and my comments were
intended only to clarify the issue at hand.  You should draw no
inference or conclusion of any kind, favorable or unfavorable,
with respect to any witness or party because of any comment,
question or instruction of mine.  It is for you alone to decide
the credibility of witnesses and the weight, if any, to be
given to the testimony you've heard and exhibits you've seen.

I97AAFLO3

1          Lastly, anything you may have seen or heard when the

2    Court is not a session is not evidence.  You are to decide the

3    case solely on the evidence presented to you in this courtroom.

4          There are two types of evidence that you may use in

5    reaching your verdict, direct and circumstantial evidence.

6    Direct evidence is when a witness testifies about something the

7    witness knows by virtue of his or her own senses, something the

8    witness as seen, felt, touched or heard.  Direct evidence may

9    also be in the form of an exhibit admitted in evidence.

10          Circumstance evidence is evidence that tends to prove

11   a disputed fact by proof of other facts.  Circumstantial

12   evidence is of no less value than direct evidence.  It is a

13   general rule that the law makes no distinction between direct

14   evidence and circumstantial evidence.

15          There's a simple example of circumstantial evidence

16   that we often use in this court House.  Assume that when you

17   came in this morning the sun as shining and it was a nice day.

18   Assume that the courtroom windows were covered completely so

19   that you couldn't see outside.  And then as you were sitting

20   here someone walked in with an umbrella that was dripping wet

21   and then a view few minutes later another person also came into

22   the courtroom with a wet with umbrella also dripping wet.  Now,

23   you can't look outside the courtroom.  You can't see whether or

24   not it's raining so you don't have any direct evidence of that

25   fact.  But on the combination of facts I've asked you to assume

I97AAFLO3

that it would be reasonable and logical for you to conclude

that it was raining outside.

        That's all there is to circumstantial evidence.  You

infer from one or more established facts like the wet umbrella

on the basis of reason, experience and common sense, the

existence or nonexistent of some or fact like it's raining

outside.  An inference is not a speculation, suspicion or

guess.  An inference is a reasoned, logical deduction for

conclusion that you, the jury, are permitted but not required

to draw from the facts that have been established by either

direct or circumstantial evidence.

        There are times when different inferences may be drawn

from the same proof of facts.  Here, the plaintiffs ask you to

draw one set of inferences, while the defendants ask you to

draw another.  It is for you alone to decide what inferences

you'll draw.

        You've now had the opportunity to listen and observe

all of the witnesses.  It is now your job to decide how

believable you find each witness's testimony.  How do you

determine where the truth is?  You should use all the tests for

truthfulness that you would use in determining matters of

importance to you in your everyday life.

        One thing you should consider is any bias hostility or

affection that witness may I have shown for or against a party.

It is your duty to consider whether a witness has permitted any

I97AAFLO3

such bias to color his or her testimony.  If you find a witness
is biased, then you should view the witness's testimony with
caution, weigh it with care and subject it to close and
searching scrutiny.

You should also consider any interest or motive that
the witness may have in cooperating with a particular party, as
well as any interest the witness may have in the outcome of the
case.

Let me just point out that all of the witnesses here
were parties.  So all of the witnesses have an interest in the
outcome of the case.

Interest in the outcome of a case creates a motive to
testify falsely and may sway a witness to testify in a way that
advances his or her interests.  Therefore, you should accept
the testimony of the interested witness with great care.  Keep
in mind though that it does not automatically follow that
testimony given by a interested witness is to be disbelieved.
There are many people who no matter how strong their interest
in the outcome of the case would not testify falsely.  It is
for you to decide based on your own perceptions and common
sense to what extent, if at all, the witness's interest has
affected his or her testimony.

Additional factors you should consider are the
opportunity the witness had to see, hear and know the things
about which he or she testified, the accuracy of the witness's

I97AAFLO3

memory, the witness's candor or lack of candor.  The witness's

intelligence, the reasonableness of the testimony, the

testimony's consistency or lack of consistency with other

credible testimony.  In other words, what you must try to do in

deciding credibility is size up the witness in light of the

witness's demeanor, the explanations given in all of the

evidence in the case.  Always remember you should use your

common sense, your good judgment and your own life experience.

          If you find that any witness has willfully testified

falsely to any material fact, that is to any important matter,

then the law permits you to disregard the entire testimony of

that witness based on the principle that one who testifies

falsely about one material fact is likely to testify falsely

about everything.  You are not required however to consider

such a witness as totally unworthy of belief.  You may accept

so much of a witness's testimony as you deem true and disregard

what you feel is false.

          While it's quite legitimate for an attorney to try to

attack the credibility of a witness, as the sole arbiters of

the facts you must decide for yourselves which witnesses you

will believe, what portion of their testimony you will accept

and what weight you will give to the testimony.

          I am now going to explain the concept of "burden of

proof".  This is a civil case.  So burden of proof is by a

"preponderance of the evidence".

I97AAFLO3

1          The party with the burden of proof on any given issue

2     has the burden of proving to you every disputed element of that

3     party's claim by a preponderance of the evidence.

4          As I told you before, there's really only one issue

5     left in the case which is whether the defendants are the

6     employers of the plaintiffs.  And I will instruct you in more

7     detail but basically, the plaintiff has the burden of proving

8     that by a preponderance of the evidence.

9          What does that mean "preponderance of the evidence"?

10     To establish a fact by a preponderance of the evidence means to

11     prove that the fact is more likely true than not true.  A

12     preponderance of the evidence means the greater weight of the

13     evidence which refers to the quality and persuasiveness of the,

14     not to number of witnesses or documents.  In determining

15     whether a claim has been proved by a preponderance of the

16     evidence, you should consider all the relevant testimony

17     regardless of who may have called the witness and all of the

18     relevant exhibits received into evidence, regardless of who may

19     have produced them.

20          If you find that the credible evidence on a given

21     issue is evenly divided between the parties, meaning it is

22     equally probable that one side is right as it is that the other

23     side is right, then you must decide that issue against the

24     party having the burden of proof.  That is because the party

25     with the burden of proof must prove more than the simple

I97AAFLO3

equality of evidence.  On the other hand, the party with the

burden of proof does not need to prove any more than a

preponderance of the evidence.

So I'd like to think of it as being on a set of

scales.  As long as you find that on a given issue if the

scales tip however slightly in favor of the party with the

burden of proof, then you must find for that party on the issue

as that issue will have been proved by a preponderance of

evidence.  But if the scales balance and they don't tip or they

tip away from the party with the burden of proof, then you have

to find it against that party.

So once more I remind you as I did at the beginning of

the trial that proof beyond a reasonable doubt is the standard

of a criminal case.  It doesn't apply here.  You should put it

out of your mind.

So let's get to the issue that you are going to have a

decide.  I am now going to tell you about the law that you'll

have to apply to the facts as you find them.

As I instructed you, the only remaining dispute or

issue in this case for you to decide is whether the individual

defendants were plaintiffs' employers within the meaning of

federal and state labor laws.  As I said before you'll have to

decide that question as to each defendant and each plaintiff.

So in order for an individual defendant to be liable

under both the FLSA, that is the Federal Labor Law and New York

1    Labor Law, a plaintiff must show by a preponderance of the

2    evidence that the individual defendant was his or her employer.

3          An individual, not just a company, can be an employer

4    under the law.  The liability of an individual defendant

5    depends on whether that individual possessed the power to

6    control the plaintiff's work.  The focus is on the economic

7    realities in the situation rather than technical concepts or

8    job titles.

9          Several facts may be relevant to determining whether

10   an individual defendant is an employer.  No single fact is

11   controlling and you must make your decision based on the

12   totality of the circumstances.

13         You may consider whether the defendant in question had

14   the power to hire and fire the plaintiff, had the power to

15   supervise and control the plaintiff's work schedules or the

16   power to supervisor control the plaintiff's conditions of

17   employment, had the power to determine the plaintiff's rate of

18   pay and method of payment and had the power to maintain

19   employment records.

20         The factors I've just listed are not exhaustive.  You

21   may consider any other factors that you think are relevant to

22   determining whether an individual defendant had the power to

23   control the means and the manner of each plaintiff's

24   employment.  You may also consider whether the individual

25   defendant had operational control of the company that employed

I97AAFLO3

the plaintiff, possessed an ownership interest in the company or controlled significant functions of the business.  However, being an owner or officer of the company is not enough standing alone to make the individual defendant an employer.

He must also have some involvement in the way the company interacts with employees such as workplace conditions and operations, personnel or compensation.

A defendant can be an employer under the law even if his or her control over the employer is restricted, indirect or exercised only occasionally.  The law does not require an individual to have been personally complicit in wage violations in order to be an employer.

Plaintiffs have the burden to prove by a preponderance of the evidence that each defendant was his or her employer and you must make a separate decision for each defendant.

You're not responsible for determining the amount of damages if there are any or any other issues in the case.  So with these instructions in mind you'll now hear from the lawyers who will give their closing arguments.  I remind you that arguments by lawyers are not evidence because the lawyers are not witnesses.  However, what they say to you in their closing arguments are intended to help you understand the evidence and reach your verdict.  So please pay careful attention to their arguments.

I'll also mention that since as I said the plaintiff

has the burden of proving the employer issue the plaintiff gets
the last word.  So, the plaintiff will begin.  Then the
defendant will have his closing argument and then the plaintiff
will have brief rebuttal.

         All right.  Mr. Mulholland.

         MR. MULHOLLAND:  Like, said in my opening, there are
three issues, wages, hours and who is responsible.  At this
point we've resolved the first two, so we get to focus on this
last one, who is responsible.  There is some language to the
charge that the judge gave you that I want you to focus on and
that's economic reality.

         This is very much a case where the owner and the
employer is trying to hide behind the screen middle managers to
escape his responsibility to make sure his employees got paid
properly.  You heard testimony from both sides that there were
all sorts of managers but none of them seemed to quite be the
employer.  We also this guy, had this person and three guys we
never heard of before.  That is the smokescreen.

         The economic reality is that Satinder Sharma most of
all was the employer for the entire operation, not just for
both plaintiffs here but I would contend for anyone who worked
at Pasta & Risotto.  How do we know that?  Well, checks,
signing checks.  I don't know what stronger evidence could be
provided that someone, an employer is intervening in someone's
pay, intervening in the conditions of someone's employ than

1    person who signs the check.

2          He is also a 50 percent owner.  Of course as the Court

3    told you, 50 percent ownership alone isn't enough but it's a

4    great start.  And this is not a case where there's a minority

5    owner.  This is a 50 percent owner.  We heard from the

6    plaintiffs that the other owner was completely absent from the

7    business.  Who does that leave?  Satinder Sharma.

8          We heard that Satinder Sharma himself -- well -- some

9    other language in the charge that's very important, had the

10   power.  Had the power doesn't necessarily mean used most of the

11   time.  Who had the power?  Where does the buck stop?  I would

12   submit that Satinder Sharma is where the buck stops.  We know

13   that because he became the contact person for late payments.

14   We learned that from Ms. Mukhina herself.  And we also after a

15   little bit of work we learned that from Mr. Sharma himself.

16         Power to hire and fire, I think the first question I

17   asked Mr. Sharma was, do you have the power to hire and fire?

18   He said "no".  Yet when confronted with deposition testimony it

19   became clear that he did indeed, at least in the past, confess

20   that he had the power to hire and fire.  How a 50 percent owner

21   wouldn't have the power to hire and fire is beyond -- I'm not

22   sure what limits could possibly stop him from hiring and

23   firing.  Even in the deposition testimony I was able read, he

24   admitted to hiring managers.  I am hiring people cause you are

25   the boss.

1          Another piece of evidence I thought was very

2    significant was the fact that Ms. Mukhina was issued checks

3    from Brick Lane Curry House which is not a restaurant where she

4    worked.  Why would a woman who doesn't work at a restaurant get

5    checks from that restaurant for her pay?  The only thing

6    connecting the two of those with Brick Lane Curry House is

7    Satinder Sharma.  What does that mean?  That means she's

8    working for Satinder Sharma.

9          Who can forget the daily income reports?  Well, it was

10   sent in a group text.  All sorts of people got the dailies.

11   Fifty percent owner, you sign peoples' checks.  You are hiring

12   managers.  You admitted you to the power to hire and fire.  You

13   are also getting daily income reports.  The idea that this

14   person wouldn't be responsible or wouldn't be aware of the

15   labor violations in his own restaurant is absurd.  Oh, wait.  I

16   have too many restaurants.  These people worked for between

17   four to three years and should know how your people are being

18   paid, make sure your people are being paid properly.

19         We did hear from Ms. Mukhina that Satinder Sharma

20   visited Pasta & Risotto & between two and three times a week.

21   Mr. Sharma himself and Mr. Montoya stated that maybe it was one

22   a week, twice a week, OK.  He's there.  He's talking to people.

23   He's aware of the operations.  He knows what's going on.  This

24   is someone who I would contend without a doubt in the economic

25   reality, the boss.  The employer.  It's not the W2 managers who

1    come and change every six months.  It's him.  He is the guy

2    that was the common denominator throughout the entire period

3    including after.

4         Mr. Montoya.

5         We heard from Mr. Carrasco how Mr. Montoya intervened

6    and determined Mr. Carrasco's schedule.  We heard from Mr.  --

7    go back.  We heard from Mr. Montoya himself that he was

8    underneath an executive chef but he was the head chef within

9    Pasta & Risotto itself, that he had no one else.  And we heard

10   from Mr. Montoya himself that he disciplined many of the

11   kitchen workers ostensibly, I suppose to make sure the health

12   department was happy and to make sure things were clean.

13        Whatever the purpose, he took it upon himself and

14   became the person to assign work tasks, to discipline, to make

15   sure that the back of the house was working properly.  You

16   heard from Mr. Carrasco that it was Mr. Montoya who set his

17   schedule.  You heard from Mr. Carrasco that it was Mr. Montoya

18   who -- discipline.

19        You also heard from Mr. Carrasco that it was

20   Mr. Montoya who gave him a sizable majority of his work tasks,

21   brought him from deliveries into the kitchen to do cleaning

22   tasks, to prepare food.  Mr. Carrasco testified it was upwards

23   of four hours a day that he was brought into the kitchen to

24   help Mr. Montoya.  It's plaintiff's contention that that

25   behavior, that seniority and that level of involvement with the

1   conditions of Mr. Carrasco's employ made him an employer.

2          As the judge charged you, the factors there are

3   something you may consider.  These are just some of the main

4   principle factors.  There's another question I'd like you to

5   ask yourself, sort of -- who profited from the wage violations.

6   Who gained?  Who gained from payments?  Mr. Carrasco, a fixed

7   weekly salary, $350 a week, when he was working upwards of 75

8   hours a week.  Who profited, if not Satinder Sharma?  Who

9   profited from paying Ms. Mukhina?  $25 straight for whatever

10  shift she worked.  Who proffered from not paying Ms. Mukhina

11  for weeks at a time?  Young woman, working student, working

12  four to five days a week, counting on those checks to come in.

13  Who profited from that?  Thank you very much for your time and

14  I note on behalf of myself and my clients and defendants, as

15  well.  Thank you.

16          THE COURT:  Thank you.

17          Mr. Lehman.

18          MR. LEHMAN:  My first thought right now when I look at

19  the jury is my walk home because I go to the subway and I go

20  down Duane Street and there is not a person that I know in New

21  York who doesn't think about Duane Reade when they go by Duane

22  Reade.  But what I also think about is who the street is named

23  after, James Duane.  He was the first mayor of New York once we

24  were the United States of America.  In 1789 he was the first

25  federal judge.  This is not a convenience store and none of

1   what has happened in this dispute ahs been convenient, having

2   eight people here is not convenient, having a judge here is not

3   convenient.  All of this is not convenient.  But the law is the

4   law, is the law.  And that's the agreement that we all made in

5   1789 and that's the agreement today.

6            Now this is not by any stretch of the imagination the

7   biggest case in the world and now it's only over one issue.

8   The jury's job is not to decide who should be responsible or

9   what we would like.  It's not to say where you would like the

10  buck to stop or who could have fixed this.  The company

11  admitted responsibility.  Just as I told you in the beginning,

12  the company would admit responsibility but that doesn't mean

13  that these two individuals here are responsible under the law.

14           What I would like you to focus on is what the judge

15  read in your instruction.  Being an owner or officer of the

16  company is not enough standing alone to make the individual

17  defendant an employer.  He must also have some involvement in

18  the way the company interacts with employees such as workplace

19  conditions and operations, personnel or compensation.

20           Now I heard Mr. Mulholland call this a smokescreen but

21  I have a narrative that fits all the evidence.  Mr. Sharma used

22  to be in the restaurant industry.  He then began to purchase

23  with another partner or several various restaurants.  Because

24  it went up to six, according to his testimony, they hired a

25  team.  They had a general manager that oversaw all the

1    restaurants and they had an executive chef who oversaw all the

2    chefs.  They had an executive chef who oversaw all the chefs.

3    Each restaurant was its own LLC and each restaurant had a

4    manager, the last of whom was according to the evidence, and we

5    would contend one, of the plaintiff's friends.

6            The restaurant hit hard times.  The restaurant closed

7    its door on August 15, 2015.  It is not shocking that a

8    restaurant that is going under would owe one person money but

9    that does not translate this into a violation of FLSA in the

10   sense that it doesn't make these guys the employer.  Now

11   whatever principle is going to be applied for who the employer

12   is has to apply to both of them equally.  The owner and the

13   cook whatever principle that these two plaintiffs want to apply

14   to suit both of them at the same time should apply equally.

15   Because this plaintiff is contending that both of them are her

16   employer.  And this plaintiff is contending that both of them

17   are her employer.  So what principle by which would they have

18   the chef which could be a term of respect for an older man who

19   is a cook in a restaurant and a 50 percent owner, not both

20   owners, just one owner.

21           Mr. Mulholland asked you a question at the end of his

22   closing argument, Who profited?  Well, the answer is, the

23   company profited.  And then that if there was a profit it went

24   to the owners but we know it wasn't that profitable.  The

25   evidence is the restaurant closed.  What I believe was trying

1    to happen there is because someone profited therefore, they're

2    responsible.  But we know that's not true.  The instructions

3    are just because someone's an owner doesn't mean they are

4    responsible any more than a shareholder in a large corporation

5    would be responsible as an employer or an owner for everything

6    that happens in that company.

7           Now this is a different situation.  It is not

8    McDonald's but it is still a company.  It is still a

9    restaurant.  Again, he must also have some involvement in the

10   way the company interacts with the employee such as workplace

11   conditions, operations, personnel or compensation.

12          There is from what I can tell little dispute over how

13   much Mr. Sharma was there, three times a week, two times a

14   week, one time a week.  What did he do when he was there?  Was

15   there any testimony that he talked to the plaintiff or the

16   other plaintiff?  He doesn't speak Spanish.  How is he

17   determining their workplace condition?  He didn't hire either

18   of these people.  He didn't fire them.  The store shut down.

19   He didn't control their schedule or have the power to supervise

20   them.

21          Now let's focus on that for a second.  The power to

22   supervise.  He set up these investments so that that they would

23   purchase the restaurant, have an LLC and then there was someone

24   else who it took care of it which is imminently sensible when

25   you have six restaurants that you are trying to make money off

of.  That's what owners would do but that doesn't mean that

he's determining the paycheck.

You'll also heard where that power was delegated to,

the manager.  If you want to know where the buck stopped, it

should have stopped with the manager.  That's what they get

compensated for.  And you saw just like you saw Mr. Sharma's

signature on the check.  And by the way, you never saw a check

that he filled out completely but you did see other managers.

And someone filled out those checks completely because the

plaintiff testified that they weren't hers.

In fact, here is how little one of the plaintiff's

interactions was with Mr. Sharma.  It was asked and you may

recall:

Did you hear Mr. Sharma's discussions with the

manager?  And she said, No.  I tried not to listen.

So she can't even testify that he knew what was going

on in terms of the day-to-day business.

And you can also judge their credibility.  There was a

moment in the trial you may remember when I asked about this

common word, a little bit stilted.  The reason why that was

important was because I wanted to see if they would be

consistent.  Remember at the beginning I said there will be

inconsistencies here?  They allege after having met with lawyer

as she testified, have you met with a lawyer, that they

understood the complaint when they filed and that everyone was

1    paid the same way.  She was paid by checks.  He was paid by

2    checks, pointing to the chef.  You know who didn't say he was

3    paid by checks?  The delivery person.  But he signed a

4    complaint after having met with lawyers and said we were all

5    paid the same way.

6            Mr. Sharma's interactions with Ms. Mukhina increased

7    dramatically after the restaurant closed.  But isn't that what

8    we want people to do?  The restaurant owes you money.  Do the

9    right thing.  But that doesn't transform you for all those

10   years that you were there to the employer.  He said I wanted to

11   do the right thing.  The person's owed money.

12           You may also recall that when asked, Did you ever see

13   Mr. Sharma give directions to managers about how to run the

14   business?  I did not see him personally.  And you may also

15   remember on Exhibit Number Three that had the hours recorded,

16   was that Mr. Sharma's handwriting?  No.  Was that the cook's

17   handwriting?  No.  Whose handwriting was it?  The manager's

18   handwriting who was keeping track of hours.

19           And at any point the plaintiffs could have gone to the

20   manager and said, this is how much I'm owed.  In fact that's

21   what happened.  That's why all the checks had different

22   amounts.  Because they would go to the manager and say this is

23   what I'm owed.  And they would sign it.  Now if the manager

24   wasn't there and they would use a blank check.  But that

25   doesn't mean that Mr. Sharma is engaged in day-to-day payroll

1   or knowing how they're getting paid in a situation where the

2   restaurant admits that it is liable and takes responsibility

3   for it.

4           You may also remember in terms of her time that when

5   she testified she said, I kept records at home.  And this goes

6   to her credibility.  Wouldn't the best times to bring those

7   records here be here in federal court before a jury that's

8   impaneled so that we could be accurate.  You can use that to

9   evaluate whether or not she is telling the truth about whether

10  or not these two people had daily interactions with her and

11  were controlling her workplace environment.

12          And you know there's a lot of focus on the 50 percent

13  owner here, right?  But they also sued the chef and the cook

14  who said he gave the schedule to them because he spoke Spanish.

15  And I'm really at a loss to think of what we would want from a

16  restaurant if someone is not their your job and you're part of

17  a team and everyone could get in trouble with a health

18  inspection and it gets closed, then everyone loses their job,

19  not to say to someone, pick up your mess.  If that interaction

20  leads to him becoming an employer it is certainly something I

21  want to know because I have a lot of clients who I want to

22  inform, don't tell other people to clean-up your mess.

23          In fact, Ms. Mukhina said this.  Who gave you your

24  schedule?  The managers at the time.  That wasn't my question.

25  That was from her own counsel.  Who trained you?  The two

I97AAFLO3                    Closing Statement - Lehman

1    waitresses that worked there at the time.  Not either of these

2    defendants.  And then there was a lot of hubbub about whether

3    or not there was a punch card.  They are not legally required

4    to have a punch card.  You are legally required to record the

5    time, the manager, the last one who was Vanja.

6            And as far as this underpayment goes, we're New

7    Yorkers.  On that we can take two issues using our common sense

8    and credibility.  Do restaurants in New York dramatically

9    increase in business around Christmas on 52nd between Second

10   and Third?  Or is your experience that the place becomes kind

11   of dead?  And if she's keeping records, why couldn't we

12   determine when the overtime was?  Again, the company accepts

13   responsibility but what that question goes toward is her

14   credibility on her interactions with both of these gentlemen.

15           And let's remember, this as far as her credibility.

16   Remember when I started asking about Vanja.

17   "Q.  Who was your last manager?

18   "A.  Last manager, Vanja Bojic.

19   "Q.  Are you friends with Vanja?

20   "A.  We don't speak that much.  Occasionally, she can text me

21   something but we're not close friends.

22           Then I asked her about a text message.

23   "Q.  Did you ever text Satinder?  Please don't ask Vanja to

24   talk to me.  She is my friend.

25   A.   yes.  It was after we started preparation for trial

because he tried to text me.  He started to text me and to tell

me why do you want to go to trial if you are going to involve

Vanja, it's going to hurt her.

So they're not close friends but who is the only

person who she is concerned about in this situation? Vanja.  I

can only think of two reasons.  One, she doesn't want Vanja to

come here and testify that it was Vanja's responsibility for

all of this because she was the manager.

I said two reasons but I am at a great loss to see why

someone who wasn't close friends would text someone after a

lawsuit started or ask the 50 percent owner not to contact that

person about what happened.  It is undisputed she was the

manager and she was the one who would know what happened.

And we could remember in the beginning I said, I think

they would be inconsistent and I think there would be times

when you said "I don't remember".  So I would ask, whose

handwriting is this on the check?  I don't know.  Do you know

who gave this check?  I don't recall.  Everyone else testified,

well, I believe the managers gave the checks to him.  But how

could you be working somewhere with only one manager at a time

and not know who filled out that check and not recognize the

handwriting?

Look, we can also consider this.  She's owed money by

the restaurant.  It angers you.  I would get angry.  You owe my

money.  I want my money I worked for this and you have a

1    motivation to therefore use whatever law you think you can find

2    to come in this court to get money but that doesn't mean that

3    this law was violated by these two individuals.  It doesn't

4    mean that they're employers.  And that is not what juries do.

5              THE COURT:  Three minutes.

6              MR. LEHMAN:  This is what I'll say.  Every plaintiff

7    who has been wronged wants a jury to follow the law.  Every

8    defendant who has been wrongly accused of something wants the

9    jury to follow the law.  The only people who don't want you to

10   follow the law are people who want to abuse the system.

11             The good news is I've never known a jury not to do

12   this in all my years.  I know that people go into that room and

13   whatever prejudices they have against an owner or whatever they

14   think the law should be every jury I've ever known has done

15   their best and I believe that you will too.  I believe that you

16   will say it doesn't matter what I think, the law should be, who

17   could fix that problem.  It matters what the situation is and

18   it matters how to apply it, knowing that both of those

19   plaintiffs contend that both of these guys are their employers.

20   And now you may ask under this legal definition who was that

21   person?  And is that person here?  And is that person friends

22   with one of the plaintiffs?

23             Thank you very much.

24             THE COURT:  All right.  You have five minutes.

25             MR. MULHOLLAND:  Very briefly.

1          First, I I'd like to point out that Exhibit Three is

2    not recording hours.  It's a recording of pay during a shift,

3    both the shift pay, the $25 and whatever tips were earned that

4    particular day.  We're not deciding wages an hour today.

5          The other thing I wanted to bring up with you is

6    witness credibility.  One of the powers that you have as jurors

7    is to evaluate one's credibility.  I hope that you'll ask

8    yourselves when you start deliberating which of the witnesses

9    were being completely candid with you.  I would submit that

10   Mr. Sharma in particular did not come here to be candid.  He

11   came here to muddy the waters.  And I think if you ask yourself

12   that question you might come to the same conclusion.

13         Thank you again.

14         THE COURT:  All right.  Thank you.

15         That concludes the closing arguments you are going to

16   go into the jury room to begin your deliberations.  When you go

17   into the jury room the very first thing you should do is elect

18   one of your jurors to be the foreperson.  That person will

19   preside over the deliberations and people speak for you here in

20   open court.  That person has no greater voice or authority than

21   any other juror but that person is like the liaison between you

22   all and the Court.  So that person will send out notes.  And

23   when you have reached a verdict, he or she will notify the

24   marshal that the jury has reached a verdict.

25         We'll provide for you a copy of the three exhibits

I97AAFLO3                    Closing Statement – Lehman

1    that have been admitted into evidence and send them into the

2    jury room with you and you should feel free to refer to those

3    during your deliberations.  If you want any of the testimony

4    read back you can request that but please remember that when

5    you request testimony, if you do, the lawyers first have to

6    agree on what portions of testimony might be called for then we

7    will have to find it and then if they disagree I will have to

8    resolve their disagreements and that can be a time consuming

9    process.  So please try to be as specific as possible if you

10   request testimony.

11          Your request for testimony or any other communications

12   you have with the Court should be made to me in writing, signed

13   by foreperson with the time indicated on it and given to the

14   marshal in an envelope.  But the one thing, do not put in a

15   note that you send out is where you stand at any point.  Don't

16   ever say oh, our vote is a four to two or whatever it is.

17   Don't say that.  You should only tell me what your result is

18   once you have reached a verdict and as I mentioned your verdict

19   as to be unanimous.  So let me explain that.

20          The most important part of case is the part now that

21   you an jurors are about to ply and it is for you and you alone

22   to decide whether the plaintiffs have sustained their burden of

23   proof as I've explain to you with respect to their claim.  If

24   you find that the plaintiffs have succeeded you should return a

25   verdict for the plaintiff.  But if you find that the plaintiffs

1   is have failed to sustain their burden on any of the questions

2   that I ask, you should return a verdict in favor of the

3   defendant.

4           I know you'll try the issues you've been presented

5   according to the oath that you took at the very beginning of

6   the trial.  You promised you would well and truly try the

7   issues joined in this case and a true verdict render.  It is

8   your duty jurors to consult with one another and deliberate

9   with a view to reaching an agreement.  Each of you must decide

10  the case for yourself but you should only do that after you

11  have had a chance to consult with an discuss with your fellow

12  jurors.

13          You should also not hesitate to change your opinion

14  when or if you become convinced that you are incorrect.  Every

15  juror should be heard.  No one juror should hold center stage

16  or monopolize or control the deliberations.  As I said, your

17  verdict must be unanimous.  But you are not bound to surrender

18  honest convictions concerning the effect or weight of the

19  evidence for the mere purpose of returning a verdict or solely

20  because of the opinion of other jurors.  Discuss it and weigh

21  your respective opinions dispassionately without regard to

22  sympathy, prejudice or favor for either party and adopt the

23  conclusion that your good conscience appears to be in

24  accordance with the truth.

25          Again, each of you must make your on conclusion about

1   the proper outcome of the case based on your consideration of

2   the evidence and your discussions with each other.  No juror

3   should surrender his or her conscientious beliefs solely for

4   the purpose of rendering a unanimous verdict.

5          In just a second I am going to give each of you a

6   verdict sheet and the purpose of the questions is to help us,

7   the Court, the attorneys, the plaintiffs, the attorneys, the

8   plaintiffs to understand what your findings are.  You should

9   not draw any inference from the way the questions are worded as

10  to what the answers should be and the questions shouldn't be

11  taken as any indication of my opinion as to how they should be

12  answered.  As I mentioned, I don't have any opinion about that.

13         You should answer every question and after you've

14  reached a verdict the foreperson should fill-out one copy of

15  the verdict sheet, sign it, date it and then keep it.  Give a

16  note to the deputy or the marshal stating you've reached a

17  verdict.  Then I'll bring you out here.  Don't say what your

18  verdict is in the note.

19         Pass out the verdict form.

20         (Pause)

21         THE COURT:  So this is the verdict form.  It has four

22  questions on it and the first one, they all go to the issue of

23  whether the defendants will -- the first one is:

24         Has plaintiff Carrasco shown that defendant Sharma was

25  his employer?

1        And just so you know, the burden of proof as I

2    mentioned is proof by a preponderance of the evidence.  So

3    plaintiff has to show by a preponderance of the evidence that

4    defendant Sharma was his employer.

5        Second question is similar:

6        Has the plaintiff Mukhina shown that the defendant

7    Sharma was her employer?

8        And the next two questions are about Mr. Montoya.

9        Has the plaintiff Carrasco shown that defendant

10    Montoya was his employer.

11        The fourth:

12        Has the plaintiff Mukhina shown that the defendant

13    Montoya was her employer?

14        And that's all the questions.  And then on the back on

15    one copy you'll all sign and then the foreperson will sign

16    again with the date and time.  You'll keep the form.  Despite

17    what it says at the top, don't give it to the marshal.  Keep it

18    in your hand and just give the marshal a note saying you've

19    reached a verdict and then we'll come back and deal with it.

20        You have to be in agreement with the verdict as

21    announced in Court.  So you all have to unanimous agree as to

22    each question.  And when you come back in here and give me your

23    verdict form, I'll actually poll you and say Juror No. 1, is

24    that your verdict?  Juror No. 2, and I'll ask each of you

25    whether the verdict that has been reflected in the form given

1    to me is the verdict of each of you.

2           So I'll remind you that you took an oath to render

3    judgment impartially and fairly without prejudice, sympathy,

4    without fear solely upon the evidence in the case and the

5    applicable law and it is your duty, I know you'll do your duty

6    to reach a just and true verdict.

7           One final word and I say this not because I think it's

8    necessary.  It is the custom to say it here, so I will.  And

9    that is that you should treat each other with courtesy and

10   respect during your deliberations, notwithstanding, any

11   disagreements you may have.  All litigants stand equal in this

12   room.  All litigants stand equal before the bar of justice and

13   your duty is to decide between those parties fairly and

14   impartially to see that justice is done all in accordance with

15   your oath.

16          So thank you so much for your time and your hard work.

17   We have provided lunch and we're actually going to go to lunch

18   too.  So if you have a question, we're probably not going to be

19   available.  We'll be available probably for just a couple

20   minutes but after that we probably won't be available for about

21   an hour or an hour and a half.  You can use that time to eat

22   and deliberate and then we'll be waiting to hear from you if

23   you have any questions or if you have your verdict, we'll be

24   available.

25          So, would you swear the marshal please.

1            (Marshal sworn)

2            COURTROOM DEPUTY:  You are in the hands of the

3    marshal.

4            THE COURT:  Have a good lunch.

5            (Luncheon Recess)

6            THE COURT:  I am about to send the exhibits back to

7    the jury room.  If you want to inspect them, you may.

8            MR. LEHMAN:  That's fine, your Honor.

9            THE COURT:  All right.  OK.  Thank you everyone and

10   have a good lunch.

11           We are adjourned.

12           (Luncheon Recess)

13           THE COURT:  We have a note from the jury.  They've

14   reached a verdict.

15           Mr. Lehman's replacement is Mr. Jones.

16           (Jury present)

17           THE COURT:  You may be seated.

18           Ms. Helburn, I understand you are the foreperson and

19   that the jury has a verdict.  May I have your verdict form?

20           FOREPERSON:  Yes.

21           (Pause)

22           THE COURT:  OK.  First, I'll read the verdict form and

23   then I'll poll the jury.

24           Question One.  Has Plaintiff Carrasco shown that

25   Defendant Sharma was his employer?

1              Answer:  Yes.

2              Question Two.  Has Plaintiff Mukhina shown that

3     Defendant Sharma was her employer?

4              Answer:  Yes

5              Question Three.  Has Plaintiff Carrasco shown that

6     Defendant Montoya was his employer?

7              Answer:  No

8              Question Four.  Has plaintiff Mukhina shown that

9     Defendant Montoya was her employer?

10             Answer:  No.

11             And it is signed by all of the jurors except Juror No.

12    Three, who was excused.

13             So let me poll the jury.  Ms.  Helburn, is that your

14    verdict?

15             A JUROR:  Yes.

16             THE COURT:  Ms. O'Donoghue, is that your verdict?

17             A JUROR:  Yes.

18             THE COURT:  Mr. Linton, is that your verdict?

19             A JUROR:  Yes.

20             THE COURT:  Ms. Willis, is that your verdict?

21             A JUROR:  Yes.

22             THE COURT:  Mr. Meehan, is that your verdict?

23             A JUROR:  Yes.

24             THE COURT:  Mr. Nordmann, is that your verdict?

25             A JUROR:  Yes.

1          THE COURT:  And Mr. Charles, is that your verdict?

2          A JUROR:  Yes.

3          OK.  Thank you, ladies and gentlemen, for all of your

4    hard work.

5          What I neglected do, Mr. Lehman had to excuse himself.

6    His colleague, Mr. Jones, is here in his place.  So, Mr. Lehman

7    has not undergone a dramatic change in appearance.  We have his

8    colleague here with us instead.

9          What I wanted to do was just thank you and then excuse

10   you.  I know it's not easy to be a juror and to sit in judgment

11   of other people.  But as I said, before I think it's a really

12   important civic duty and I've also found that people really

13   find it rewarding.  So I hope you enjoy the experience and that

14   it was rewarding.  We certainly appreciate it.  So thank you to

15   all of you.

16         So here is what I would like to do is I'd like you to

17   go back to the jury room.  Leave all of your papers there.  I'd

18   like to come back and shake all of your hands and thank you and

19   then you'll be free to leave.  So could you just wait for me in

20   the jury room.

21         Thank you.

22         (Jury dismissed)

23         THE COURT:  I wanted to thank counsel, particularly,

24   for working together.

25         Mr. Jones, I know you'll convey this to Mr. Lehman but

I97AAFLO3                     Verdict

1    I know it wasn't always easy and at times it was rancorous and

2    I really appreciate the professional way that you were able to

3    work together to make this work efficiently and well.

4              So thank you to both counsel very much.

5              MR. MULHOLLAND:  Well, your Honor.  Thank you.

6              MR. LEHMAN:  Thank you.

7              (Adjourned)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    INDEX OF EXAMINATION

2    Examination of:                          Page

3    SATINDER SHARMA

4    Direct By Mr. Mulholland . . . . . . . . . . . 106

5    Cross By Mr. Lehman  . . . . . . . . . . . . 132

6    Redirect By Mr. Mulholland . . . . . . . . . 148

7    FELIX D. MONTOYA

8    Direct By Mr. Lehman . . . . . . . . . . . . 152

9    Cross By Mr. Mulholland  . . . . . . . . . . 156

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25